Michael D. ST. CLAIR, Appellant

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2011–SC–000774–MR.

Supreme Court of Kentucky.

Aug. 21, 2014.

Rehearing Denied Feb. 19, 2015.

602

Susan Jackson Balliet, Samuel N. Potter, Robert Chung–Hua Yang, Assistant Public Advocates, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, William Robert Long, Jr., Assistant Attorney General, Office of Criminal Appeals, Office of the Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

Michael D. St. Clair has previously been convicted of capital murder and sentenced to death. On remand and retrial of the penalty phase of his trial, he has again been sentenced to death. In this matter-of-right appeal, conducted concurrently with this Court's mandatory review of the death sentence, he raises 32 claims of error, some of which go to his conviction. None of those claims require reversal; this Court concludes that the death sentence was legally imposed here. St. Clair's conviction and sentence are affirmed.

## I. Background

The facts of the underlying offenses have been described in detail in the opinion addressing St. Clair's first direct appeal, see St. Clair v. Commonwealth, 140 S.W.3d 510, 524–25 (Ky.2004) (St. Clair I), but a brief summary of those facts is necessary to frame the issues in the current appeal.

In 1991, St. Clair was in prison in Oklahoma awaiting sentencing for his conviction for two murders.[1] He and another inmate, Dennis Gene Reese, escaped from prison in a stolen truck. Soon after, they stole another truck from Vernon Stephens, and a .357 Magnum Ruger Black Hawk revolver and ammunition that were used in later crimes, and fled the state. After travelling to Colorado, they kidnapped Timothy Keeling and stole his truck.

They drove through New Mexico and, before returning to Texas, murdered Keeling. They then travelled through several southern states before ending up in Hardin County, Kentucky in October 1991.

In Hardin County, they kidnapped Frances Brady (also known as Frank Brady) and stole his pickup truck. They transported Brady to Bullitt County, where they murdered him execution style.

Soon after, Kentucky State Trooper Herbert Bennett stopped Reese and St. Clair in Brady's truck in Hardin County. St. Clair fired shots at the trooper's vehicle, allowing Reese and St. Clair to flee the scene. They parted ways and were later arrested separately.

In February 1992, St. Clair and Reese were jointly indicted in Bullitt County for Brady's murder. Reese pleaded guilty and agreed to testify for the Commonwealth. St. Clair pleaded not guilty.

The case went to trial in 1998. St. Clair testified and claimed an alibi defense. The primary factual issue at trial was whether Brady had been killed by St. Clair, Reese, or an unidentified accomplice. The jury convicted St. Clair of the murder, and the trial court sentenced St. Clair to death in accordance with the jury's recommendation.[2]

This Court affirmed the conviction but remanded for a new capital sentencing phase trial because the jury was not instructed on life without the possibility of

---

1. St. Clair had actually committed four murders, though he had yet to be tried for two of them. He was convicted of all four murders by the time of his 1998 trial in Kentucky, and was given consecutive life sentences for them.

2. St. Clair was separately indicted for capital kidnapping of Brady in Hardin County, and this Court held that St. Clair was not thereby subjected to double jeopardy by trial on that charge after having been convicted of murder in Bullitt County. See St. Clair v. Roark, 10

S.W.3d 482, 486 (Ky.1999). St. Clair was convicted in Hardin County and also sentenced to death for that crime. See St. Clair v. Commonwealth, 174 S.W.3d 474, 476 (Ky. 2005). This Court reversed the conviction. Id. at 486. He has since been convicted and sentenced to death again for capital kidnapping. That conviction and sentence are the subject of a separate appeal in Case No. 2012–SC–000130–MR.

parole as a sentencing alternative. *St. Clair I,* 140 S.W.3d at 526.

In September 2005, St. Clair was again sentenced to death. In April 2010, this Court reversed that sentence and remanded for a new sentencing phase because the jury instructions on statutory aggravators did not conform to the statutory language. *See St. Clair v. Commonwealth,* 319 S.W.3d 300, 306–08 (Ky.2010) (*St. Clair II* ).

Shortly after, in July 2010, St. Clair moved for a new trial, claiming that new evidence about comparative bullet lead analysis (CBLA) evidence, which had been used in the guilt phase of his 1998 trial, had been discovered. Specifically, the new proof was that CBLA had been found to be unreliable and thus inadmissible. This was a collateral attack on the conviction. The circuit court did not rule on the motion until January 2011, at which time it denied the motion. Initially, St. Clair sought interlocutory relief at the Court of Appeals, but he voluntarily dismissed the action when the Commonwealth argued that the order was interlocutory and could be consolidated with the appeal of the sentence, which at that time had yet to be decided. The circuit court agreed with this argument, noting that a Criminal Rule 10.02 motion, like a new trial motion under Civil Rule 59.01, becomes part of the appeal of the judgment.

In October 2011, the circuit court again held a sentencing trial lasting nine days. The jury was chosen in the first four days, and the proof occupied the next four days. The Commonwealth's proof consisted of summaries of testimony from some of the witnesses from the guilt phase of the trial and live testimony from numerous other witnesses, including Reese. On the last day, the jury deliberated for a little over two hours and returned a death-penalty verdict. St. Clair was later sentenced in accordance with that verdict.

St. Clair's appeal, encompassing both the denial of his new-trial motion and his death sentence, is now before this Court as a matter of right. *See* Ky. Const. §§ 110(2)(b) & 115; *Leonard v. Commonwealth,* 279 S.W.3d 151, 155 (Ky.2009) ("This Court has exclusive appellate jurisdiction over death penalty matters, even when the appeal involves a collateral attack on a sentence of death.").

## II. Analysis

St. Clair's thirty-two claims to this Court fall into two broad areas. Three of his claims, the CBLA claim plus two others, are aimed at the underlying conviction, and can only be raised at this point under limited circumstances, since his conviction has previously been affirmed by this Court. The remaining claims are part of the direct appeal of his most recent death sentence, though some of them touch on our statutory review under KRS 532.075 and are discussed with that review. Because of procedural issues affecting only the first group of claims, we address them separately.

Before turning to St. Clair's claims, however, it is useful to first lay out the scope and nature of this Court's review in a death-penalty case. As noted above, appeals of cases in which a defendant has been sentenced to death proceed to this Court as a matter of right. But this Court is also statutorily charged with reviewing death sentences. *See* KRS 532.075. That review requires this Court to "consider the punishment as well as any errors enumerated by way of appeal." KRS 532.075(2).

In death penalty cases, "[p]reserved errors are reviewed under normal standards." *Meece v. Commonwealth,* 348 S.W.3d 627, 645 (Ky.2011). Such errors

are subject to harmless-error review, except in certain cases. *See* RCr 9.24.

■ In ordinary criminal cases, unpreserved errors are reviewed only under the palpable error rule, RCr 10.26, a substantially higher standard than that employed in harmless-error review. But "[d]eath is unlike all other sanctions the Commonwealth is permitted to visit upon wrongdoers." *Rogers v. Commonwealth*, 992 S.W.2d 183, 187 (Ky.1999); *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) ("the penalty of death is different in kind from any other punishment imposed under our system of criminal justice"). "Thus, the invocation of the death penalty requires a more expansive standard of review than is normally necessary in the criminal justice process." *Meece*, 348 S.W.3d at 645.

■ Under this more expansive review, "we nonetheless review allegations of these [unpreserved] quasi errors." *Sanders v. Commonwealth*, 801 S.W.2d 665, 668 (Ky.1990). That review proceeds as follows:

> Assuming that the so-called error occurred, we begin by inquiring: (1) whether there is a reasonable justification or explanation for defense counsel's failure to object, e.g., whether the failure might have been a legitimate trial tactic; and (2) if there is no reasonable explanation, whether the unpreserved error was prejudicial, i.e., whether the circumstances in totality are persuasive that, minus the error, the defendant may not have been found guilty of a capital crime, or the death penalty may not have been imposed.

*Id.* In other words, if the failure to object was due to trial tactics, the unpreserved error will still be given only palpable error review under the manifest injustice standard. If the failure to object has no reasonable basis, then the raised error will be reviewed for prejudice as ordinary error, although unpreserved. This standard, however, is applicable only to issues properly raised in the direct appeal. As discussed below, some of St. Clair's claims are not properly raised in this appeal, having been addressed previously or procedurally defaulted because they were not raised previously, and thus they are not subject to this standard.

## A. Claims about the underlying conviction for murder.

As noted above, three of St. Clair's claims are attacks on his underlying murder conviction. Those claims are that a new guilt phase is required because of changes in this Court's interpretation of KRE 404(b), an impermissibly suggestive identification affecting St. Clair's due-process rights, and new forensic evidence about comparative bullet lead analysis (the basis of the Criminal Rule 10.02 motion).

Since St. Clair's conviction for murder has previously been affirmed, *see St. Clair I*, 140 S.W.3d at 523, 572, directly appealable[3] issues related to the guilt phase of his trial and addressed on appeal would ordinarily be barred in any subsequent appeal, direct or otherwise, by the law-of-the-case doctrine, *see Bowling v. Commonwealth*, 377 S.W.3d 529, 535 (Ky.2012). And those issues that had not been previously raised to the trial court, but could have been, would be treated as procedurally defaulted. *See Fischer v. Fischer*, 348 S.W.3d 582, 588, 594 (Ky.2011).

---

3. We have distinguished between those issues that can be raised on direct appeal and those that can and should be raised by way of a collateral attack. *See Leonard v. Commonwealth*, 279 S.W.3d 151, 156–58 (Ky.2009).

### 1. The KRE 404(b) challenge is barred by the law-of-the-case doctrine.

██ St. Clair admits in his brief that he "challenges here the same prior bad acts that were challenged in his first appeal." (Appellant's Br. at 17.) This KRE 404(b) claim was litigated and rejected in his first appeal. *See St. Clair I,* 140 S.W.3d at 535–36. Under the law-of-the-case doctrine, "an appellate court, on a subsequent appeal, is bound by a prior decision on a former appeal in the same court." *Inman v. Inman,* 648 S.W.2d 847, 849 (Ky.1982). As it applies to the circumstances in this case, the rule means that "issues decided in earlier appeals should not be revisited in subsequent ones." *Brown v. Commonwealth,* 313 S.W.3d 577, 610 (Ky.2010). That bars this Court from revisiting St. Clair's already decided issue. In simple parlance, he only gets one bite at each apple, and this apple was bitten long ago.

Nevertheless, St. Clair claims that he should be allowed to raise this issue anew, despite the law-of-the-case doctrine, because of alleged changes in the law that would now bar the admission of the complained-of evidence. He cites *Estep v. Commonwealth,* 64 S.W.3d 805, 812 (Ky. 2002), as supporting an exception to the law-of-the-case doctrine. In that case this Court stated:

> The law of the case doctrine does not apply where the controlling law changes in the interim, and the issue is not ripe until the change in controlling law occurs; otherwise, "[a]pplication of the law of the case doctrine would require every

defendant and every prosecutor to immediately challenge every aspect of the law involved in the case or forever be denied relief."

*Id.* at 812 (quoting *Sherley v. Commonwealth,* 889 S.W.2d 794, 798 (Ky.1994)).

Even assuming that the law on other bad acts has changed since his initial appeal,[4] St. Clair is not entitled to relief. The exception to the law-of-the-case doctrine discussed in *Estep* and *Sherley* is not nearly as broad as St. Clair claims.

██ This exception is limited to instances where the issue has not previously been raised because it was "unripe" due to the law being against the defendant's position at the time. *See Sherley,* 889 S.W.2d at 798. *Sherley* suggested that the purpose of this exception is so that defendants and prosecutors do not have "to immediately challenge every aspect of the law involved in the case or forever be denied relief." *Id.* St. Clair strenuously litigated and appealed—and lost—the KRE 404(b) issue at his 1998 trial, and that result was upheld in the 2004 decision by this Court. St. Clair cannot take advantage of an exception designed to account for issues that have never been litigated when, in fact, he litigated the issue. The law-of-the-case doctrine exists to "serve the important interest litigants have in finality, by guarding against the endless reopening of already decided questions, and the equally important interest courts have in judicial economy, by preventing the drain on judicial resources that would result if previous

---

4. And it is not at all clear that there has been a change in the law like that discussed in *Sherley* (applying a change in federal law concerning the standard applied in habeas corpus cases) and *Estep* (applying a change in the law allowing a claim of self-defense to a charge of reckless homicide). As St. Clair admits in his brief, "the underlying principles of prior bad acts law have not changed in the past eight years." (Appellant's Br. at 18.) In fact, the applicable rule, KRE 404(b), has not changed since its adoption in 1992. This Court's "clarification" (to use St. Clair's term) of how the rule works at the margins does not suggest the sort of significant change in the law discussed in *Sherley* and *Estep.*

decisions were routinely subject to reconsideration." *Brown,* 313 S.W.3d at 610.

■ This exception to the law-of-the-case rule is for the "limited situation where the controlling law changes after reversal of a conviction but prior to a subsequent re-trial." *Sherley,* 889 S.W.2d at 798. St. Clair's conviction in the guilt phase has been affirmed. and is final. His retrials have only been of the penalty phase, not the guilt phase. The exception does not apply to his situation.

St. Clair emphasizes in his reply brief that the law-of-the-case doctrine is discretionary. No doubt, the rule "is a prudential doctrine, ... not a jurisdictional one," *Brown,* 313 S.W.3d at 610; it "directs a court's discretion" but "does not limit the tribunal's power," *id.* (quoting *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)). But that is why we have exceptions to the rule as described above. And St. Clair does not meet any of the exceptions.

Application of the law-of-the-case doctrine is appropriate here to "guard[ ] against the endless reopening of already decided questions." *Id.* St. Clair has already had one appeal of the KRE 404(b) questions; he does not get a second.

**2. The challenge to the identification is procedurally barred because it could have been raised in the first appeal.**

■ St. Clair admits that his claim about the purportedly suggestive identification was not raised at trial or litigated in the first appeal. At this point, appeal of that issue is procedurally barred.

■ First, "[i]t has long been this Court's view that specific grounds not raised before the trial court, but raised for the first time on appeal will not support a favorable ruling on appeal. Most simply put, '[a] new theory of error cannot be raised for the first time on appeal.' " *Fischer,* 348 S.W.3d at 588 (quoting *Springer v. Commonwealth,* 998 S.W.2d 439, 446 (Ky.1999)) (second alteration in original).

But, as St. Clair notes, the standard of review of unpreserved errors in death penalty cases is much looser than it is for regular cases. That would be an appropriate consideration if this was the first appeal.

■ St. Clair has already had a chance to raise this claim on appeal. He is entitled to only one appeal as a matter of right. "Generally, a litigant may not raise on a subsequent appeal any question that *could have been raised* as well as those that were raised upon a former appeal." *Hampton v. Commonwealth,* 133 S.W.3d 438, 444 (Ky.2004) (emphasis added). "[A]n extension of the core law-of-the-case doctrine is the rule that precludes an appellate court from reviewing not just prior appellate rulings, but decisions of the trial court which could have been but were not challenged in a prior appeal." *Brown,* 313 S.W.3d at 610. This is "a type of waiver" that "hinges ... on the party's inaction in failing to raise the issue in a manner consistent with the court's general policy against piecemeal appeals." *Id.* We stated in *Brown* that this "waiver rule applies only where a 'ruling of law is made based on existing law and that ruling has gone unchallenged during the original appeal.' " *Id.* at 611 (quoting *Sherley,* 889 S.W.2d at 798). St. Clair has not claimed that the law on identifications has changed since his trial. In fact, one of the primary authorities on which he relies was decided in 1972. *See Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

■ Regardless, *Brown's* "existing law" limit on the waiver would not allow the issue to be raised here even if the law had changed. That limit applies when the trial court has ruled, expressly or impli-

edly, on a question, but it does not apply when the litigant fails completely to raise the issue before the trial court or on the first appeal but nevertheless could have done so. This is why issues that could have been raised on the direct appeal cannot be raised in a collateral attack. *See Leonard v. Commonwealth*, 279 S.W.3d 151, 156 (Ky.2009). And if such issues cannot be raised collaterally, then obviously they cannot be raised in a subsequent direct appeal of the part of the judgment that was reversed and retried if they relate to the portion of the judgment that was affirmed. Otherwise, St. Clair would essentially get a second direct appeal of his conviction.

This Court concludes that a litigant in St. Clair's position cannot raise an issue for the first time in such a second appeal. Indeed, if his sentence had not been reversed (requiring re-trial of the penalty phase), he would have had no opportunity to raise this issue. He is not entitled to a second direct appeal of his murder conviction tacked onto the appeal of the re-tried penalty phase. His claim, therefore, is procedurally barred. *Cf. Leonard*, 279 S.W.3d at 156 (applying a "pure procedural bar" to issues "that could and should have been litigated in the direct appeal").

3. **The revelations about CBLA evidence do not justify a new trial in light of the evidence of St. Clair's guilt.**

■ St. Clair's complaint about the use of the comparative bullet lead analysis

(CBLA) proof[5] in the guilt phase of his trial is properly before this Court, however, because the motion was timely and does reference a change in the science and law that had not occurred in 1998 when this case was tried to completion in the guilt phase, which has been appealed and is now final as previously mentioned.

CBLA is a technique by which an expert compares the lead in a bullet or bullet fragments to that in another bullet and, based on trace amounts of other elements in the compared specimens, attempts to determine whether they came from the same source. Using the technique, experts have suggested, for example, that different bullets "originated from the same batch of molten lead," and claimed that this suggested the bullets did, or could have, come from the same box. *Ragland v. Commonwealth*, 191 S.W.3d 569, 576 (Ky.2006). The basis for this theory was the belief that a batch of bullet lead was homogenous, i.e., with the same levels of trace elements throughout, and that "analytically identical" bullets were thus from the same batch. *Id.* at 577.

But CBLA, which was previously thought to be based on sound science, is now known to be unreliable as it has previously been practiced—so much so, that the FBI has discontinued its use. *Id.* at 579–80.[6] In essence, the technique fails because the fact of two bullets being analytically identical is not statistically signifi-

---

**5.** This is also known as compositional analysis of bullet lead (or CBLA).

**6.** The FBI's decision was driven by a report it commissioned from the National Research Council of the National Academies of Science titled *Forensic Analysis: Weighing Bullet Lead Evidence* (2004). *See Ragland v. Commonwealth*, 191 S.W.3d 569, 578 (Ky.2006) ("In response to these criticisms by its former [de facto] chief metallurgist, the FBI in 2002

commissioned the National Research Council of the National Academies of Science (NRC) to evaluate the conclusions being drawn by its employees from CBLA test results against the reliability requirements of *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The FBI suspended CBLA testing while the review was pending. In February 2004, the NRC rendered a 113-page report, entitled *Forensic Analysis: Weighing Bullet Lead Evidence*,

cant. *Id.* It has been determined that the technique cannot show, nor can it even suggest, that there is a substantial probability that a bullet came from a given box of bullets. *Id.* Thus, it is clear that there was a substantial change in the scientific understanding of the composition of bullet lead and the conclusions that could be drawn from it. *Id.* at 580 ("[N]either scientists nor bullet manufacturers are able to definitely attest to the significance of an association made between bullets in the course of bullet lead examination." (quoting Press Release, U.S. Dep't of Justice, Fed. Bureau of Investigation (Sept. 1, 2005))).

Based on this change in the science, this Court concluded that CBLA evidence, as previously understood and used, is inadmissible. *See id.* ("If the FBI Laboratory that produced the CBLA evidence now considers such evidence to be of insufficient reliability to justify continuing to produce it, a finding by the trial court that the evidence is both scientifically reliable and relevant would be clearly erroneous, and a finding that the evidence would be helpful to the jury would be an abuse of discretion." (citation omitted)).

The CBLA issue was brought to St. Clair's attention by a letter from the FBI to the Commonwealth in 2009, forwarded to his counsel, which stated that CBLA was not scientifically reliable and could not be used to match bullets. It also stated the FBI had previously undertaken a review of the CBLA evidence in St. Clair's case "to determine if there was a suggestion by the examiner that a bullet fragment ... was linked to a single box of ammunition without clarification that there would be a large number of other bullets or boxes of bullets that could also match those fragments" and had mistakenly concluded that the testimony had been "appropriate." The letter noted that the CBLA testimony in St. Clair's case was inappropriate because "the examiner failed to provide sufficient information to the jury to allow them to understand the number of bullets produced from a single melt of lead."

Unlike, the KRE 404(b) question discussed above, there has been a substantial change in the law concerning CBLA proof; more importantly, there has been a significant factual change in the scientific understanding of the proof used at trial. And though St. Clair did not raise the issue in the prior trial, he is not foreclosed from raising the CBLA claim because it was not ripe in 1998. At the time, the forensic scientific community, or at least the FBI and thus the courts, believed the technique was a valid one. In fact, it appears that substantial challenges to the understanding of CBLA may have only begun around the time of St. Clair's first trial. *See id.* at 578 (noting critical publications in 2002 and 2003).[7]

And St. Clair has litigated this issue through the proper procedural channel, a motion for a new trial under Criminal Rule 10.02, rather than attempting a

---

which evaluated CBLA against each *Daubert* criteria and determined that the conclusions drawn from CBLA do not meet the scientific reliability requirements established by *Daubert/Kumho*."). The report is available online at http://www.nap.edu/openbook.php?isbn= 0309090792.

7. The defense expert in *Ragland* was William A. Tobin, the retired FBI metallurgist whose criticism led the FBI to commission the National Research Council report that ultimately led to the FBI's discontinuing CBLA testing. Tobin worked at the FBI until 1998, *see* William A. Tobin, *Comparative Bullet Lead Analysis: A Case Study in Flawed Forensics,* Champion, July 2004, at 12, 21 n. a1, approximately the same time that St. Clair was first tried.

successive matter-of-right appeal. Criminal Rule 10.02 allows a defendant to move for "a new trial for any cause which prevented the defendant from having a fair trial, or if required in the interest of justice." RCr 10.02(1). Proper grounds for such a motion include the discovery of new evidence. *See* RCr 10.06(1) (noting "newly discovered evidence" as grounds for a motion for a new trial).[8]

St. Clair's motion in the circuit court alleged that new evidence, specifically the letter from the FBI discussing the flaws in CBLA, had been discovered, and that this proof showed that the use of CBLA evidence in the 1998 trial was error.

In the 1998 trial, FBI Special Agent Ernest Peel testified that, based on CBLA, the bullets[9] used to kill Timothy Keeling in New Mexico were "very close in composition" to those used to kill Frank Brady, and that "[i]t would make sense that all of these [compared bullets] are from the same box." He also testified that while bullets in a single box might have some differences, "those differences are not very great" and that "if you're looking at any two pieces of lead and you find that they have the same composition, that is when you would expect if they were in the same box" or at least packaged "on or about the same date." He also testified that the bullets fired at Trooper Bennett were compositionally different from the others.

On cross-examination, Agent Peel admitted that bullets in a single box can come from different batches because there is some "mixing of different compositions" and that he couldn't rule out that the bullets had come from different boxes, even though they may have been made at the same time.

The trial court denied St. Clair's motion for a new trial on the basis that Agent Peel had been "extremely cautious in his conclusions," and emphasized that Agent Peel had admitted that the bullets could have come from different boxes. The trial court concluded that the CBLA evidence was "inconsequential" and "harmless."

On appeal, St. Clair maintains that the CBLA evidence was error, at least in light of the new evidence concerning the technique, and that he was substantially prejudiced by it. He claims that the CBLA evidence was the only evidence aside from Dennis Reese's testimony directly tying him to the murder of Timothy Keeling. He also claims that the Commonwealth emphasized the CBLA testimony in its closing argument. He claims that the evidence was so prejudicial that it tainted his 1998 conviction and the 2011 death sentence that depended on the 1998 guilty verdict.

■■■ There is no question that the CBLA evidence would not be permitted today. The change in scientific understanding of bullet lead composition is new

---

8. There is no suggestion that St. Clair's Criminal Rule 10.02 motion was untimely. Ordinarily, such a motion must be brought within one year of entry of the judgment, but it may be brought "at a later time if the court for good cause so permits." RCr 10.06(1). A fundamental change in the scientific understanding of a forensic technique—especially where the technique, as earlier practiced, is fundamentally discredited—is surely such good cause, as long as the issue is raised to the trial court in a reasonable time. St. Clair

filed his motion approximately one year after it was brought to his counsel's attention. This Court cannot say that was unreasonable under the facts of this case.

9. Apparently, police recovered bullet fragments, not whole bullets. That distinction does not change this discussion. In fact, some of the forensic evidence specifically discusses "bullets" as including "bullet fragments."

evidence that, if sufficiently prejudicial, could require a new trial as it did in *Ragland*, albeit in the direct appeal of that case.[10] But the mere fact that such evidence would now be inadmissible does not mean that St. Clair is entitled to a new trial. Indeed, this Court has declined to reverse at least one capital conviction, despite the admission of CBLA evidence at trial, because the defendant was not sufficiently prejudiced. *See Bowling v. Commonwealth*, 2006–SC–000034–MR, 2008 WL 4291670, slip op. 4–5 (Ky. Sept. 18, 2008) (unpublished).

▌ To warrant a new trial, "newly discovered evidence 'must be of such decisive value or force that it would, with reasonable certainty, change the verdict or that it would probably change the result if a new trial should be granted.' " *Collins v. Commonwealth*, 951 S.W.2d 569, 576 (Ky. 1997) (quoting *Coots v. Commonwealth*, 418 S.W.2d 752, 754 (Ky.1967)). And this Court reviews the trial court's denial of a new-trial motion based on newly discovered evidence for abuse of discretion. *Bedingfield v. Commonwealth*, 260 S.W.3d 805, 810 (Ky.2008). This Court cannot say that the Bullitt Circuit Court abused its discretion in denying St. Clair's motion.

Simply put, the CBLA proof, which never claimed that the bullets had to have come from the same box, was only part of a large amount of evidence presented against St. Clair. As this Court previously described it, the proof consisted of Reese's testimony directly implicating St. Clair as Frank Brady's killer, along with the following:

> (1) Trooper Bennett's identification of [St. Clair] as the man who had fired two shots in his direction on the night of the murder; (2) another man's identification of [St. Clair] and Reese as being in possession of a vehicle similar to Brady's vehicle at a gas station/convenience store in the area; (3) testimony relating to telephone calls made to [St. Clair's] friends and relatives back in Oklahoma from a payphone located at this same gas station/convenience store; (4) testimony identifying items found in Kentucky—on the victim's person and in his pickup truck—as similar to or the same items that [St. Clair's] then-wife had given to [St. Clair] and Reese when she met them in Texas; (5) a jailhouse informant, Scott Kincaid ("Kincaid"), who testified that [St. Clair] had admitted his involvement in the crime; (6) ballistics evidence demonstrating that the same handgun could have fired the shots that killed both Keeling and Brady and damaged Trooper Bennett's cruiser and bullet composition evidence suggesting that bullets from the same box killed Keeling and Brady; and (7) testimony to the effect that [St. Clair's] fingerprints were found both on items recovered from inside the Brady vehicle and on the outside door of the same vehicle.

*St. Clair I*, 140 S.W.3d at 525.

The CBLA evidence, included under item (6), was but a small part of the overall proof. Moreover, the CBLA evidence was not the only forensic proof tying the gun to both the Keeling and Brady murders.

Additionally, FBI expert, Special Agent Richard Crum, testified about the bullets recovered from the bodies of Keeling and Brady, and bullets recovered from the scene of the attempted shooting of the state trooper. This testimony was not based on CBLA. Instead, Agent Crum did traditional ballistics analysis of the bullets,

---

**10.** The report on which the FBI relied in choosing to discontinue CBLA testing came out while *Ragland* was being decided.

along with empty shell casings retrieved from the house from which the gun had been stolen in Oklahoma. Agent Crum's analysis looked at the physical markings from the barrel of the gun left on the bullets and the shell casings. He concluded that the markings on the bullets and shell casings from Reeling's and Brady's killings were all "similar," [11] and that a .357 Magnum Ruger Black Hawk, the gun that St. Clair and Reese stole in Oklahoma, "could have fired" the bullets that killed Keeling and Brady.[12] While Agent Crum's testimony was less sure of the connection than that of Agent Peel, it was nevertheless expert testimony suggesting a connection between the bullets on which the jury could have relied at least in part in finding St. Clair guilty.

More importantly, the other proof, including direct testimony from Reese that St. Clair was present and shot Frank Brady, presents a compelling case for St. Clair's guilt that does not rely on the experts' testimony. That Reese was a convicted felon and subject to various forms of impeachment does not change this, since the jury could still believe his testimony and, in fact, was the sole decider of questions of credibility and weight of the evidence.

In *Ragland,* this Court concluded that the CBLA evidence used in that case could not be harmless because the conviction was based only on circumstantial evidence and the CBLA evidence "was the only evidence linking [the defendant] to the murder bullet." *Ragland,* 191 S.W.3d at 582. That is not the case here. There

was substantial evidence that St. Clair was a full participant in the crime spree with Reese and that St. Clair killed Frank Brady. In light of that evidence, the Bullitt Circuit Court concluded that "the bullet lead composition analysis is inconsequential, and its use, if error, was harmless."

In light of the other evidence in this case, there is little chance, much less a reasonable certainty, that St. Clair would have received a different verdict given what we now know about the limits of CBLA, nor is it probable that the result would change if a new trial was granted. St. Clair does not meet the requirements for a new trial under *Collins* and *Coots.* Thus, we conclude that the Bullitt Circuit Court did not abuse its discretion in denying St. Clair's motion for a new trial.

St. Clair also suggests in his opening brief that even if he is not entitled to a new trial of his guilt, the reading of a summary of the expert testimony in his sentencing re-trial requires reversal of his death sentence. However, as the Commonwealth points out, and St. Clair admits in his reply brief, Agent Peel's testimony was not summarized for the re-sentencing jury in 2011. It therefore had no effect on that jury's decision to impose a sentence of death. (The argument that this testimony had an indirect effect on the re-sentencing jury because it relied on the 1998 jury's guilty verdict is similarly unpersuasive; as discussed above, that testimony had little if any effect on the 1998 jury.)

**B. Claims about the resentencing.**

The remaining claims relate only to the resentencing. We address each in turn to

---

11. The bullets fired at Trooper Bennett were so damaged that they could not be compared to the other bullets.

12. In his reply brief, St. Clair objects that even this type of ballistics evidence is being challenged, and that the Commonwealth, in reading a summary of Agent Crum's testimo-

ny at the re-sentencing, incorrectly suggested that Crum testified that the bullets were "identical" and "probably" fired from a .357 Magnum Ruger Black Hawk. These issues, however, were not raised to the trial court, and thus are not before this Court.

the extent they do not touch on our KRS 532.075 review, which is addressed separately below.

**1. St. Clair's objection to the "Jefferson County" voir dire process was waived by his counsel, and it was neither a substantial deviation from the rules nor was it prejudicial.**

 St. Clair argues that the trial court erred by not following this Court's mandatory rules concerning voir dire and instead followed the so-called Jefferson County method. Specifically, he complains that voir dire was directed to the entire venire of approximately 80 people,[13] rather than a smaller group equal to the number of jurors to be chosen, with those excused replaced from the remaining venire.[14] He claims this violated Sections 1 and 10 of Part II of the Administrative Procedures of the Court of Justice. St. Clair admits that the issue is not preserved for review.

At a pretrial hearing, the trial court asked both sides whether it would like to follow the "rules" or the "Jefferson County method." St. Clair's counsel said he preferred the Jefferson County method, having practiced mostly in that county. The trial court noted that it would need a waiver from St. Clair if they decided not to follow the Administrative Procedures. No express verbal waiver of the Administrative Procedures was obtained at the hearing, though St. Clair was present. The trial court's order, entered the same day as this hearing, stated that St. Clair, along with his counsel, "personally . . . agreed to use the procedures generally used in Jefferson Circuit Court." At a subsequent hearing, the trial court raised the question again, just after it was agreed that St. Clair would conduct the general voir dire himself (rather than his lawyer). The prosecutor stated, "I thought we all agreed on the Jefferson County way." The trial court stated, "It's a lot easier." St. Clair was also present at this hearing. He now claims the statement in the trial court's order that he had personally waived was incorrect and that he, in fact, did not personally waive the strict application of the Administrative Procedures.

 St. Clair cites no authority for the proposition that he had to personally waive the right to strict application of jury selection rules. Indeed, what authority there is on the subject demonstrates that counsel can waive many rights related to trial procedure. "Giving the attorney control of trial management matters is a practical necessity." *Gonzalez v. United States*, 553 U.S. 242, 249, 128 S.Ct. 1765, 170 L.Ed.2d 616 (2008). The simple fact is that "[t]he adversary process could not function effectively if every tactical decision required client approval." *Id.* (quoting *Taylor v. Illinois*, 484 U.S. 400, 418, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)). Thus, many aspects of trial management are subject to waiver by counsel, and do not require a personal waiver from the defendant.

Even so, the only evidence of record clearly indicates that St. Clair agreed to use the "Jefferson County method" as was

---

**13.** St. Clair repeatedly complains of having to address "100 jurors," but admits that only "up to 80 jurors" remained for group voir dire. (Appellant's Br. at 30.)

**14.** St. Clair suggests that the number to be called for questioning should have been fourteen jurors (twelve jurors plus two alternates). But the proper number is actually the number of jurors to be finally seated plus alternates and the number of peremptory challenges allocated to each side. *See Oro–Jimenez v. Commonwealth*, 412 S.W.3d 174, 177 (Ky. 2013). In this case, the number should have been thirty-two (twelve jurors, two alternates, and eighteen to account for peremptory strikes), not fourteen.

stated in the judge's written order. He had ample opportunity to object at the two pretrial hearings where the issue was discussed, and the trial court's order gave ample notice of the method to be used. And St. Clair was acting partly as his own counsel (he was set to conduct part of the voir dire). Despite all this, he made no objections. (If in fact his attorney did not explain the voir dire process to him or if the attorney proceeded over St. Clair's objection, then that is an extra-record matter properly addressed as a collateral matter and not as a direct appeal.) Thus, there was no error under these circumstances.

**2. The trial court's limits on asking about the penalty range in voir dire were neither an abuse of discretion nor a violation of the Constitution.**

St. Clair also claims that the trial court erred in voir dire by not allowing his counsel to ask whether a venire member would consider the "low end" of the penalty range and instead allowed inquiry only as to the entire penalty range. He also claims the trial court erred by dismissing another venire member, who stated that he would only consider death, before defense counsel could explain that an aggravating factor might mean only a prior criminal record and thus support a lesser penalty. St. Clair argues that the trial court violated his "right of inquiry" of the jury in these instances and affected his ability to intelligently exercise his peremptory challenges.

The basis for this claim is a concurring opinion by Justice Leibson in *Miracle v. Commonwealth,* 646 S.W.2d 720, 722 (Ky. 1983). That view, however, was not adopted by a majority of the Court. This Court has long held that "it is within the trial court's discretion to limit the scope of voir dire." *Fields v. Commonwealth,* 274 S.W.3d 375, 393 (Ky.2008), *overruled on other grounds by Childers v. Commonwealth,* 332 S.W.3d 64 (Ky.2010).

Moreover, Justice Leibson's concern was about potential impartiality of the jury that general questioning could not address (the defendant sought to inquire individually about pre-trial publicity), not about completely unstructured, free questioning by counsel. Here, the relevant qualification at issue was the ability to consider the full penalty range.

 As to the first venire member, this concern was fully addressed by the entire-range question ultimately asked by counsel. "While counsel is entitled to question jurors on whether they can consider the entire range of penalties should a guilty verdict be returned, there is no 'affirmative right to ask certain specific questions of prospective jurors.'" *Fields,* 274 S.W.3d at 393 (quoting *Thompson v. Commonwealth,* 147 S.W.3d 22, 53 (Ky.2004)). We cannot say that the trial court abused its discretion in limiting counsel to asking about the full penalty range.

 As to the second venire member, it is evident that the trial court was concerned that the juror would consider only the death penalty. In fact, the court directly questioned this venire member after hearing inconsistent answers, and confirmed that the juror would consider only the death penalty if the murder was intentional or premeditated. St. Clair's counsel did not even object to the for-cause strike, nor did he ask to follow up before the strike. Instead, he opined after the fact that he would have liked the opportunity to clear up the inconsistencies himself and discover whether the venire member might have been willing to consider lesser penalties with a fuller understanding of aggravating circumstances. This Court cannot see how the trial court's action could be an abuse of discretion.

It is also not clear that St. Clair can complain that a juror was excused for cause, especially when his overall complaint appears to be framed as one concerning the trial court's limits on his ability to inquire and then exercise his peremptory challenges. This Court has recently stated that "when there is uncertainty about whether a prospective juror should be stricken for cause, the prospective juror should be stricken. The trial court should err on the side of caution by striking the doubtful juror; that is, if a juror falls within a gray area, he should be stricken." *Ordway v. Commonwealth,* 391 S.W.3d 762, 780 (Ky.2013). If this was not clear enough, we also stated: "We reiterate that trial courts should tend toward exclusion of a conflicted juror rather than inclusion, and where questions about the impartiality of a juror cannot be resolved with certainty, or in marginal cases, the questionable juror should be excused." *Id.* The trial judge did exactly that in striking the juror.

St. Clair also claims that the limit on his counsel's voir dire was discriminatory in light of the questioning allowed to the Commonwealth. Specifically, he claims that the Commonwealth was allowed to inquire about the severest penalty—death—while he was foreclosed from asking about the lowest penalty. It is not clear what questioning by the Commonwealth St. Clair is referring to, as he has not cited the relevant portion of the record. Presumably, he refers to questions by which the Commonwealth "death qualified" the jurors. But that process is simply part of making sure that the jurors will consider the full range of penalties, which in a capital case can include death. Those questions also aimed at the "require[ment] that a jury be 'life qualified' by excluding those jurors who would automatically impose death upon a finding of guilt." *Cau-*

*dill v. Commonwealth,* 120 S.W.3d 635, 654 (Ky.2003).. That process does not violate equal protection or discriminate against the defendant. Rather, it is aimed, overall, at ensuring that "the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." *Lockhart v. McCree,* 476 U.S. 162, 184, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).

St. Clair further claims the limits on voir dire violated his Sixth and Fourteenth Amendment rights. He claims that his questions were aimed at eliciting responses that would provide the basis for a peremptory challenge or a challenge for cause. He notes, properly, that a trial court abuses it discretion when "an anticipated response to the precluded question would afford the basis for a peremptory challenge or a challenge for cause." *Hayes v. Commonwealth,* 175 S.W.3d 574, 583 (Ky.2005). But, as noted above, the proper concerns here—namely, whether the venire members would consider the full penalty range, from lowest to highest—were adequately covered by the questions asked. The trial court did not bar all inquiry into a subject, which is what *Hayes* was concerned with. That was not an abuse of discretion, and thus did not violate the Sixth or Fourteenth Amendments.

### 3. St. Clair was not prejudiced by the trial court's failure to strike jurors 15, 16, and 448 for cause.

St. Clair also claims that three jurors, 15, 16, and 448, should have been struck for cause. He admits this issue was not preserved in that no additional jurors were listed that he would have used a peremptory on as required by *Gabbard v. Commonwealth,* 297 S.W.3d 844, 854 (Ky.2009), which was decided two years before the new sentencing phase in this case. St. Clair used a peremptory on juror 15, but the other two were randomly struck after

the exercise of peremptory challenges and did not sit.

First, as to the randomly struck jurors, there can be no prejudice. This Court has held that prejudice can be presumed when a juror should have been struck for cause and the defendant is instead forced to use a peremptory challenge. *See Shane v. Commonwealth*, 243 S.W.3d 336 (Ky.2007). But the "presumed prejudice" under *Shane* stems from the fact that the defendant was forced to give up a valuable right, namely, a peremptory challenge. *Id.* at 339. St. Clair did not use a peremptory challenge on either juror 16 or 448. Since these jurors did not sit on the jury and did not cost St. Clair a peremptory strike, there can be no prejudice in their not having been struck for cause.

Any complaint about the other juror was not preserved because St. Clair failed to identify another person on whom he would have expended his peremptory strike. Standing alone, this does not bar review of St. Clair's claim because this is a death penalty case, which requires a relaxed standard of review, as set forth above.

This failure to identify another person he would have struck has a dual function here. Identifying the added person to be struck is also necessary to show prejudice. *See Gabbard*, 297 S.W.3d at 854 (discussing how a *Shane* error can be non-prejudicial if the identified jurors do not sit on the jury, meaning the defendant "received the jury he wanted," and any error is "effectively cured"). By failing to identify an additional juror he would have struck, St. Clair has failed to show how he was prejudiced. It may very well be that St. Clair would not have struck another juror; the record, with no additional identified juror, is consistent with that conclusion. Thus, there was no reversible error here.

### 4. St. Clair's rights were not violated by the jurors receiving their statutory compensation.

St. Clair claims that his rights to due process and to a fair and impartial jury were violated because the jurors were paid less than minimum wage. Unsurprisingly, the jurors were paid $12.50 a day ($5 in pay, $7.50 in expenses) for their service, as prescribed by KRS 29A. 170. St. Clair moved *pro se* to have the jurors paid minimum wage, and the trial court denied the motion. St. Clair now argues that the practice violates federal and state minimum wage laws, and draws an analogy to cases holding that underpaying defense counsel can result in a violation of the defendant's rights.

First, we note that whether a jury is paid or not has no direct effect on whether the jury is legally constituted. *See Clifton v. Blackburn*, 468 S.W.2d 267, 268 (Ky.1971). In fact, this Court's predecessor has held that the fact "[t]hat [jurors] are not being paid according to law is of no prejudice, or even legitimate interest, to [a defendant] in his capacity as a defendant in a criminal proceeding." *Id.*

But even if St. Clair could somehow challenge the juror's pay, the simple fact is that they are not entitled to minimum wage for their jury service. "Jury service is a duty as well as a privilege of citizenship...." *Thiel v. Southern Pac. Co.*, 328 U.S. 217, 224, 66 S.Ct. 984, 90 L.Ed. 1181 (1946). Indeed, that is why it is frequently called jury *duty*. There is no employer-employee relationship between the state and jurors when they carry out that civic duty. *See* Op. Att'y Gen. of Ky. 76–531, at 1–2 (Sept. 9, 1976) (opining that "a circuit court juror does not fit the category of an employer-employee relationship" and thus is not covered by the

minimum-wage law); *see also Brouwer v. Metropolitan Dade County,* 139 F.3d 817, 818–19 (11th Cir.1998); *North Carolina v. Setzer,* 42 N.C.App. 98, 256 S.E.2d 485, 488 (1979) ("[J]ury duty is not a form of employment, but a responsibility owed by a citizen to the State."). Thus, jurors are not entitled to the statutory minimum wage. The few courts that have actually been presented with this borderline specious argument have rejected it. *See Brouwer,* 139 F.3d at 818–19; *Setzer,* 256 S.E.2d at 488; *Patierno v. State,* 391 So.2d 391, 392–93 (Fla.Dist.Ct.App.1980); *see also People v. Davis,* 137 Misc.2d 958, 522 N.Y.S.2d 1017, 1019–20 (N.Y.Sup.Ct.1987) (holding that low juror pay does not violate equal protection or the Sixth and Fourteenth Amendments). This Court does as well.

**5. Juror 667's excusal for hardship did not violate *Batson* and does not require reversal.**

█ St. Clair also claims that juror 667, who worked part time without benefits, was improperly struck for his socioeconomic status in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). St. Clair claims that the frequent excusal of low-income workers, necessitated in part by the low rate of juror pay, causes a systematic exclusion for low-income workers.[15]

During voir dire, the juror said he was "just barely making it" and needed to work. The judge stated that juror "need[ed] that money" and then excused him.

█ St. Clair did not object to this. He now claims that the issue should be considered partially preserved by his motion to have the jurors paid minimum

wage. Such a motion is insufficient to preserve the claimed error. Thus, our review of this claim must look at whether there is a reasonable justification or explanation for defense counsel's failure to object, and if there is no reasonable explanation, whether the unpreserved error was prejudicial. *Sanders,* 801 S.W.2d at 668. St. Clair's claim fails both prongs.

There are multiple reasons why St Clair's counsel would not have objected. First, *Batson* applies to the prosecution's use of peremptory challenges in a discriminatory way. Here, the juror asked to be excused. Thus, *Batson* was not implicated, and an objection based on it likely would have failed.

█ Second, while a court may not systematically exclude low-income jurors, *see Thiel,* 328 U.S. at 220–21, 66 S.Ct. 984, that is not what happened here. The court excused a single juror; it did not engage in "systematic and intentional exclusion of any … groups." *Id.* at 220, 66 S.Ct. 984. A "judge would be justified in excusing a [person] for whom jury service would entail an undue financial hardship" as long as that fact is not used to "support the complete exclusion of all [low] wage earners regardless of whether there is actual hardship involved." *Id.* at 224, 66 S.Ct. 984. The exclusion of a single person for financial hardship does not show a systematic or complete exclusion of low-wage earners. Again, an objection based on this would have failed. Thus, defense counsel's failure to object had a reasonable basis.

But even if St. Clair's counsel had objected—and somehow succeeded—there is little chance of a different result in the trial, and thus there is no prejudice. St.

---

**15.** St. Clair specifically states that he is not raising a claim that the jury pool was not composed of a fair cross-section of the com-

munity, or that the juror compensation statute, KRS 29A. 170, is unconstitutional.

Clair claims that the juror's experience as a low-income person was similar to his and thus he "stood a better chance of empathizing with St. Clair than the other jurors." (Appellant's Reply Br. at 13.) But to suggest that this juror would have held out against the death penalty for that reason is pure speculation. It seems equally likely that the juror could have felt negatively toward St. Clair if his counsel had objected to the juror's being excused from service. This Court sees no potential for prejudice in the excusal of this single juror.

### 6. Admission of victim-impact testimony from Timothy Reeling's wife, while error, was harmless.

St. Clair also complains that the trial court improperly allowed the sentencing jury to hear victim-impact evidence about Timothy Keeling, St. Clair's other victim after his Oklahoma escape, even though that murder was not the subject of this trial.

Keeling's widow, Lisa Hill, testified at the 2011 resentencing for about twelve minutes. She stated that her husband was a paramedic and volunteer youth pastor. She described his ministry work, which included working with inner-city teenage runaways and "street kids," and stated that he would sometimes bring the teenagers home on cold nights. She described the truck that St. Clair stole from Keeling, noting that it would have been uncomfortable for three people to ride in it, and identified photographs of it.

She described her husband as a "people person" who always cared about people. She also testified that the last night she saw him, he had been doing some housework and went to the grocery to have food on-hand for when he brought teenagers home. She described learning of his death from the police, and noted that they showed her his class ring, which was from

a Christian school. She explained that he was 22 when he was killed.

She also explained that her husband had been concerned about people being hungry and that there was a "larger purpose" to his ministry work, namely, that it was "the opportunity to share the faith that he had in Christ and the belief that there is more to life than, just even that meal" and "that if you're not right in your relationship with Christ, then nothing else matters."

Hill had not testified against St. Clair before, having not appeared at the 1998 trial or the 2005 re-trial of the sentencing phase.

St. Clair argues now that Lisa Hill's testimony was improper victim-impact testimony because she did not meet the statutory definition of a "victim." He claims that because he had not been convicted of murdering Keeling and the man's murder was not the subject of the trial, any victim-impact testimony related to the man was improper.

St. Clair raised this issue only indirectly at trial. Specifically, he filed a *pro se* motion in limine to exclude evidence of Keeling's death, without specifically addressing victim-impact testimony. The Commonwealth claims this was insufficient to preserve the issue for our review. On that point, the Court must disagree. While *pro se* litigants must follow the rules of procedure, their pleadings and other papers "are not held to the same standard as those prepared by an attorney." *Jackson v. Commonwealth,* 319 S.W.3d 347, 350 (Ky.2010). St. Clair's motion to exclude all evidence of Keeling's death necessarily included victim-impact testimony about his life and death. Even so, even if inadequately preserved, the relaxed standard set by *Sanders* would allow review.

The Commonwealth argues that the widow was a statutory victim under KRS

421.500(1). That statute defines "victim" to include "an individual who suffers direct ... physical ... harm as a result of the commission of a crime classified as ... criminal homicide." KRS 421.500(1). Obviously, Timothy Keeling met this definition. But the statute expands on this definition, if the victim is deceased, to include the spouse (or other relative), who shall be the "victim." KRS 421.500(1)(a). This is the definition to be used under KRS 532.025, the statute laying out the type of proof the jury may hear in sentencing. Thus, there is no question that Keeling and, by extension, Hill were victims of *a* crime for purposes of sentencing.

But that does not mean Hill was entitled to testify at the trial for the murder of Frank Brady. The sentencing statute states the Commonwealth can offer "[e]vidence ... relevant to sentencing including ... [t]he impact of *the* crime upon the victim, ... including a description of the nature and extent of any physical, psychological, or financial harm suffered by the victim or victims...." KRS 532.055(2)(a)(7) (emphasis added). Thus, Frank Brady's relatives could testify about the impact of the crime at this trial. And, in fact, his daughter did so, taking the stand for approximately 18 minutes.

But the phrase "the crime" as used in this statute refers to the tried crime, not any and all crimes the defendant may have committed. The use of the definite article, the word "the," signals a specific thing. *See Kentucky Unemployment Ins. Com'n v. Hamilton,* 364 S.W.3d 450, 453 (Ky.2011) ("Grammatically, 'the' is a definite article and its function is to confine or restrict the meaning of the noun that follows it to a particular thing or set of things."); *see also Sheriff of Fayette v. Buckner,* 11 Ky. (1 Litt.) 126, 128 (1822) (holding that legislative act referencing "*the* clerk of the court" intended a particular clerk of court). The crime for which St. Clair was being tried, or at least sentenced, was the murder of Frank Brady, not that of Timothy Keeling. And Lisa Hill is not related to Frank Brady.

Thus, Lisa Hill was not a victim of *the* crime for which St. Clair was being tried. If any victim of any crime committed by a defendant could testify, there would functionally be no limit to victim-impact testimony. But the purpose of such proof is to give the jury an understanding of the impact of the crime being tried, not the defendant's bad character or overall negative effect on society. Indeed, in explaining why victim-impact testimony is allowed in capital cases, the U.S. Supreme Court has noted that "the assessment of harm caused by the defendant as a result of *the crime charged* has understandably been an important concern of the criminal law." *Payne v. Tennessee,* 501 U.S. 808, 819, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

If the plain language of the statute was not clear enough, that victim-impact testimony under KRS 532.055(2)(a)(7) is limited to testimony from the victims of the charge being tried is further shown by the fact that all six of the other categories of proper sentencing evidence under KRS 532.055(2)(a) relate, at least in part, to prior convictions.[16] But the victim-impact

---

16. The full text of KRS 532.055(2)(a) reads:
 Evidence may be offered by the Commonwealth relevant to sentencing including:
 1. Minimum parole eligibility, prior convictions of the defendant, both felony and misdemeanor;

 2. The nature of prior offenses for which he was convicted;
 3. The date of the commission, date of sentencing, and date of release from confinement or supervision from all prior offenses;

provision, KRS 532.055(2)(a)(7), says nothing about prior convictions, and mentions only "the crime." Even if victims from prior convictions could testify, St. Clair had not been charged, much less convicted, of Timothy Keeling's murder when he was re-sentenced in 2011.[17] If the nature of the "prior conviction" (really, prior crime) would have been inadmissible because there had been no conviction, then clearly victim-impact testimony related to such a prior crime was also inadmissible.

Testimony from a victim of a crime for which the defendant is not being tried is not relevant to sentencing for the tried crime. The jury is entitled to know that the defendant has been convicted of other crimes, e.g., KRS 532.055(2)(a)(*l* ), and to know the nature of those crimes (e.g., that the defendant committed petty theft rather than murder, or vice versa), KRS 532.055(2)(a)(2). These provisions are relevant because the defendant's prior convictions and the nature of the crimes

giving rise to those convictions reflect directly on the defendant. But nothing in the statutes suggests that the jury should hear information about the impact of those other crimes on their victims. Such evidence is a step too far removed to be relevant to sentencing for the crime being tried, especially where the defendant has not even been convicted of the other crimes, as was the case here. *See Sherman v. State*, 114 Nev. 998, 965 P.2d 903, 914 (1998) ("[E]vidence of the impact which a murder had on the victim's family is relevant to show the damage done by the murder; evidence of previous murders is relevant to show only that a statutory aggravating circumstance exists making the defendant death eligible. In contrast, evidence of the impact which a previous murder had upon the previous victim is not relevant to show either of these facts."). Proper victim-impact testimony is thus limited to that of victims of the crime for which the defendant is standing trial and has been convicted.[18]

---

4. The maximum expiration of sentence as determined by the division of probation and parole for all such current and prior offenses;
5. The defendant's status if on probation, parole, post-incarceration supervision, conditional discharge, or any other form of legal release;
6. Juvenile court records of adjudications of guilt of a child for an offense that would be a felony if committed by an adult. Subject to the Kentucky Rules of Evidence, these records shall be admissible in court at any time the child is tried as an adult, or after the child becomes an adult, at any subsequent criminal trial relating to that same person. Juvenile court records made available pursuant to this section may be used for impeachment purposes during a criminal trial and may be used during the sentencing phase of a criminal trial; however, the fact that a juvenile has been adjudicated delinquent of an offense that would be a felony if the child had been an adult shall not be used in finding the child to be a persis-

tent felony offender based upon that adjudication. Release of the child's treatment, medical, mental, or psychological records is prohibited unless presented as evidence in Circuit Court. Release of any records resulting from the child's prior abuse and neglect under Title IV–E1 or Title IV–B2 of the federal Social Security Act is also prohibited; and
7. The impact of the crime upon the victim or victims, as defined in KRS 421.500, including a description of the nature and extent of any physical, psychological, or financial harm suffered by the victim or victims . . . .

17. According to St. Clair's brief, he was indicted for Keeling's murder, along with other charges, in April 2012 in New Mexico.

18. While some states have allowed such evidence, they have done so under different statutory schemes. *See, e.g., Belcher v. State*, 961 So.2d 239, 257 (Fla.2007) (allowing such evidence under a statute allowing "victim im-

The Commonwealth suggests that the testimony was admissible under our cases allowing "the re-sentencing jury [to] be given, if requested and in a manner subject to the trial court's discretion, a meaningful idea of the evidence both sides presented during the guilt phase and the arguments they made." *Jacobsen v. Commonwealth*, 376 S.W.3d 600, 612 (Ky.2012). The purpose of this process is to avoid a "cold jury" that "sentence[s] in the vacuum." *Id.; see also Boone v. Commonwealth*, 821 S.W.2d 813, 814 (Ky.1992) ("[C]ommon sense dictates that the second jury must be told something about what transpired during the earlier guilt phase if they indeed are not 'to sentence in a vacuum without any knowledge of the defendant's past criminal record or other matters that might be pertinent to consider in the assessment of an appropriate penalty.'" (quoting *Commonwealth v. Reneer*, 734 S.W.2d 794, 797 (Ky.1987))). Under this law, the Commonwealth argues, the proof was valid because proof of Keeling's murder was allowed in the 1998 trial under KRE 404(b).

The problem with this, however, is that evidence of the circumstances of Keeling's murder is qualitatively different from evidence of the crime's impact on its victim. Indeed, this is why victim-impact evidence is limited to the penalty phase, and is inadmissible in the guilt phase, whereas the circumstances of the crime being tried are obviously relevant and admissible in the guilt phase. The testimony given by Lisa Hill described her husband's personality and life, not the crime itself. Her testimony was not the type of KRE 404(b) evidence admitted at St. Clair's 1998 trial; it was pure victim-impact testimony, and thus was at least a step removed from the evidence previously admitted. In fact, as St. Clair notes in his brief, Hill's testimony was brand new to this trial and had not been used in the prior trials. Its admission was error.

But victim-impact testimony can also implicate constitutional rights, specifically those in the Eighth Amendment (as applied to the states through the Fourteenth Amendment), and due-process rights under the Fifth and Fourteenth Amendments.

The Supreme Court addressed victim-impact evidence in the context of the Eighth Amendment in *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). In that case, the Court concluded that a state should be allowed to choose the "substantive factors relevant to the penalty determination," *id.* at 824, 111 S.Ct. 2597 (quoting *California v. Ramos*, 463 U.S. 992, 1001, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983)), so long as the state "establish[es] rational criteria that narrow the decisionmaker's judgment

---

pact evidence" without defining the term). Those states with similar statutory schemes have disallowed such evidence. *See, e.g., Andrews v. Commonwealth*, 280 Va. 231, 699 S.E.2d 237, 271–72 (2010) (applying statute limiting victim impact testimony to "the impact of *the offense* upon the victim" to allow only testimony of "victims ... of the capital offense for which the defendant has been found guilty"); *Sherman v. State*, 114 Nev. 998, 965 P.2d 903, 914 (1998) ("Furthermore, while victim impact testimony and evidence of prior murders are specifically authorized by statute" [i.e., "impact of the crime on the victim," Nev. Rev. St. § 176.015], no Nevada statute exists which provides for the admission of evidence regarding the impact of prior murders. Therefore, we conclude that the impact of a prior murder is not relevant to the sentencing decision in a current case and is therefore inadmissible during the penalty phase."); *see also Cantu v. State*, 939 S.W.2d 627, 637 (Tex.Crim.App.1997) (holding the victim-impact evidence of victim "not named in indictment is not relevant as appellant was not on trial for her murder and such evidence serves no purpose other than to inflame the jury").

as to whether the circumstances of a particular defendant's case meet the threshold [below which the death penalty cannot be imposed]" and "[does] not limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty." *Id.* (quoting *McCleskey v. Kemp,* 481 U.S. 279, 305–306, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)). The Court concluded that victim-impact evidence met these criteria because courts have always taken into account the harm done by a criminal in deciding an appropriate sentence. *Id.* at 825, 111 S.Ct. 2597. But the Court's holding in that respect was not unlimited, as it, too, referenced "the" victim or "the" victim's family. It stated:

> We thus hold that *if the State chooses to permit the admission of victim impact evidence* . . ., the Eighth Amendment erects no *per se* bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

*Id.* (emphasis added). The Court left up to the states whether to allow victim-impact evidence, and concluded that when a state chooses to allow the evidence, it does not *per se* violate the Eighth Amendment.

Kentucky has chosen to allow such evidence in the same limited fashion. As discussed above, the General Assembly has decided that while consideration of the impact of *the crime* on the victim is appropriate, it has not chosen to authorize the type of evidence introduced in this case. Lisa Hill's testimony was not proper victim-impact evidence in this trial under Kentucky law.

The Supreme Court's cases upholding the death penalty, as exemplified by *Payne* above, focus on limiting capital-sentencing evidence to circumstances of *the* crime for which the defendant is being tried, along with evidence about the defendant himself. Indeed, the death penalty in general has been upheld as constitutional when its selection over other penalties is based on "an *individualized* determination on the basis of the character of the individual and the circumstances of *the* crime." *Zant v. Stephens,* 462 U.S. 862, 879, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (second emphasis added); *Lockett v. Ohio,* 438 U.S. 586, 589, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (describing test for whether death penalty statutes are constitutional as whether it "narrowly limits the sentencer's discretion to consider the circumstances of *the* crime and the record and character of the offender as mitigating factors" (emphasis added)). Under *Payne,* evidence of the circumstances of the crime can include the harm of the crime that is the subject of the trial.

These cases also require that a jury's consideration in capital sentencing be limited to the rational, objective criteria chosen by the legislature. *See Zant,* 462 U.S. at 877 n. 15, 103 S.Ct. 2733; *cf. id.* at 879 n. 17, 103 S.Ct. 2733 ("A State is, of course, free to decide as a matter of state law to limit the evidence of aggravating factors that the prosecution may offer at the sentencing hearing."); *id.* at 890, 103 S.Ct. 2733 (citing with approval Georgia Supreme Court's statement that a death sentence could be found unconstitutional if "evidence was submitted in support of a statutory aggravating circumstance which was *not otherwise admissible,* and thereafter the circumstance failed"). And it has always been the rule that "evidence not bearing on the defendant's character, background, or the circumstances of the offense for which he/she has been convicted may be excluded." *Caudill v. Commonwealth,* 120 S.W.3d 635, 672 (Ky.2003);

*see also Smith v. Commonwealth,* 845 S.W.2d 534, 539 (Ky.1993) (quoting *Lockett v. Ohio,* 438 U.S. 586, 604 n. 12, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)).

Though the Supreme Court has not expressly stated that evidence *improperly* admitted under the guise of its being victim-impact evidence is an Eighth Amendment violation, *Payne's* focus on *the* crime suggests that it would be. Obviously, *Payne* anticipated that victim-impact evidence is largely admissible, when a state chooses to allow it, but it did not anticipate that other evidence would be improperly admitted under statutes allowing victim-impact evidence. Other states have held that such proof violates the Eighth Amendment even under the broader rule of *Payne. See Cantu v. State,* 939 S.W.2d 627, 637 (Tex.Crim.App.1997) (holding that where murdered person "is not the Victim' for whose death appellant has been indicted and tried, ... *Payne* does not contemplate admission of such evidence as permissible under the Eighth Amendment"); *People v. Dunlap,* 975 P.2d 723, 745 (Colo. 1999) ("Evidence regarding the impact of a capital defendant's prior crimes on the victims of those crimes ... is not admissible because it is not relevant to the actual harm caused by the defendant as a result of the homicide for which he is being sentenced." (citing *Payne,* 501 U.S. at 821, 111 S.Ct. 2597)).

■ This Court agrees with that approach. The testimony from Lisa Hill is not a circumstance of *the* crime.[19] Thus, the use of Lisa Hill's testimony in sentencing St. Clair to death affected his Eighth Amendment rights and would not be permissible under *Payne v. Tennessee.*

But the admission of this evidence also affected St. Clair's due-process rights. This is because the jury was improperly allowed to consider that evidence in aggravation of St. Clair's sentence.

■ Capital sentencing has two aspects. *See, e.g., Tuilaepa v. California,* 512 U.S. 967, 971, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (noting there are "two different aspects of the capital decision-making process: the eligibility decision and the selection decision"). First, the sentencer considers whether the defendant is even eligible for the death penalty, *Tuilaepa,* 512 U.S. at 971, 114 S.Ct. 2630, and to do so must "find [at least] one 'aggravating circumstance' (or its equivalent)," *id.* at 972, 114 S.Ct. 2630. This meets the constitutional requirement that the death penalty be limited to a narrow class of murders. *Brown v. Sanders,* 546 U.S. 212, 216, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006).

In Kentucky, this is accomplished under KRS 532.025. KRS 532.025(2)(a) lists the eight specific aggravating circumstances that will make a capital defendant eligible for the death penalty. And KRS 532.025(3) bars imposition of the death penalty unless one of those eight aggravating circumstances is found by the jury to exist beyond a reasonable doubt and that finding is in writing. In this case, the jury found St. Clair death eligible because he had a record of a prior conviction for a capital offense. KRS 532.025(2)(a)(1).

■ After that, the jury decides *whether* to impose the death penalty: "Once the narrowing requirement has been satisfied, the sentencer is called upon to determine whether a defendant thus found eligible for the death penalty should in fact receive it." *Brown,* 546 U.S. at 216,

---

19. Nor is it part of the character of the accused, unlike, for example, the fact of the prior crime or conviction. Again, victim-impact evidence is a step removed from that category.

126 S.Ct. 884. It is at this point that the sentencer considers other aggravating circumstances and mitigating circumstances. Victim-impact evidence comes in as one of these other aggravating circumstances.[20] In states like Kentucky, the jury is instructed to consider all these circumstances, mitigating and aggravating, and, in effect, "weigh[s] the facts and circumstances that arguably justify a death sentence against the defendant's mitigating evidence." *Id.* at 216–17, 126 S.Ct. 884. At that point, the jury has discretion as to the weight to assign to the various aggravating and mitigating circumstances.

In this sense, "aggravating factors" or "aggravating circumstances" differ from the statutory aggravators that must be found for the defendant to even be eligible for death. Indeed, the Supreme Court has noted that the " 'aggravating circumstance' or 'aggravating factor' ... terminology becomes confusing when ... a State employs the term 'aggravating circumstance' to refer to factors that play a different role, determining which defendants *eligible* for the death penalty will actually *receive* that penalty." *Id.* at 216 n. 2, 126 S.Ct. 884.

Ultimately, however, this is a distinction without a difference when looking at due-process requirements. The due-process implication of the use evidence of aggravating circumstances has been most recently addressed by the Supreme Court in *Brown v. Sanders*, 546 U.S. 212, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006).

In *Brown*, Justice Scalia wrote for the majority that the jury's consideration of "[a]n invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." *Id.* at 220, 126 S.Ct. 884 (footnote omitted). As we have explained above, victim-impact evidence is ordinarily admitted as an other aggravating sentencing factor, but in this case, the evidence was improperly admitted. As Justice Scalia went on to explain, "If the presence of the invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it, due process would mandate reversal without regard to the rule we apply here." *Id.* at 220–21, 126 S.Ct. 884.

In *Brown*, the California court had allowed consideration of two statutory eligibility factors, later found to be unconstitutional, in the penalty phase, and allowed evidence to be adduced under those factors. However, under California law, the jury is also allowed to consider "the circumstances of the crime" as a sentencing factor, and the same evidence was admissible under that factor. The Supreme Court held that while the two statutory eligibility factors were improper, all the *evidence* that had been introduced at trial was properly before the jury in considering whether

---

**20.** In Kentucky, victim-impact evidence is not directly allowed by the capital-sentencing statute, KRS 532.025. Rather it is allowed by the felony-sentencing statute, KRS 532.055. In the past, we repeatedly assumed that victim-impact testimony allowed by KRS 532.055 is also allowed in a capital-sentencing proceeding. *See, e.g., Bowling v. Commonwealth*, 942 S.W.2d 293, 303 (Ky.1997). But it was not until recently, in one of St. Clair's previous appeals in fact, that we spe-

cifically held that victim-impact evidence, as allowed under KRS 532.055(2)(a)(7), was admissible in capital-sentencing proceedings. *See St. Clair II*, 319 S.W.3d at 316–17. We reasoned that KRS 532.025, in addition to the statutory death-eligibility aggravating factors in subsection (2)(a), allowed evidence of "any other aggravating factors as 'otherwise authorized by law,' " *id.* at 316 (quoting KRS 532.125(2)), which includes the evidence allowed by KRS 532.055(2)(a).

to impose the death penalty. The Court reasoned that because the evidence was proper, there could be no skewing of the jury's consideration whether to impose the death penalty. Put another way, "As we have explained, such skewing will occur, and give rise to constitutional error, only where the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor." *Id.* at 221, 126 S.Ct. 884.

■■■ On the other hand, when such evidence is not properly admitted, which is the case for Lisa Hill's victim-impact statement in this case, that evidence inevitably weighs in favor of the death penalty and does skew the jury toward imposing death. The sentencer has considered "evidence that would not otherwise have been before it," *id.* at 221, 126 S.Ct. 884, and thus due process has been violated. If that violation is prejudicial, then to use Justice Scalia's reasoning, reversal would be mandated. It is constitutional error if the jury hears evidence in aggravation that is not properly admissible.

Though we have not invalidated the whole category of victim-impact proof as an aggravating factor, we have in this opinion invalidated "victim-impact" evidence from non-victims. Such proof is not relevant to capital sentencing and thus is not properly included within the victim-impact proof allowed to be considered in deciding whether to impose death. Thus the testimony of Lisa Hill was adduced improperly in this case and the jury was allowed to consider improper evidence in sentencing St. Clair to death.

Admitting this improper victim-impact testimony was primarily an evidentiary error, based on a complete failure of relevance, but it also affected St. Clair's constitutional rights under the Fifth, Eighth, and Fourteenth Amendments as described above. The question, then, is whether that requires reversal of his death sentence.

■■■ Constitutional errors, save for a few "structural errors," [21] are subject to review for harmlessness. Specifically, the Supreme Court has held "that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Admittedly, some courts have read *Brown* to say that if a jury considers im-

---

**21.** "Structural errors are defects affecting the entire framework of the trial and necessarily render the trial fundamentally unfair. Such errors preclude application of the harmless error rule and warrant automatic reversal under that standard." *McCleery v. Commonwealth,* 410 S.W.3d 597, 604–05 (Ky.2013) (citing *Neder v. United States,* 527 U.S. 1, 8–9, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)). Structural error exists "only in 'a very limited class of cases.'" *Neder,* 527 U.S. at 8, 119 S.Ct. 1827 (quoting *Johnson v. United States,* 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)). The Supreme Court has identified little more than half a dozen such errors: (1) "complete denial of counsel," *id.,* (2) "biased trial judge," *id.,* (3) "racial dis-crimination in selection of grand jury," *id.,* (4) "denial of self-representation at trial," *id.,* (5) "denial of public trial," *id.,* (6) "defective reasonable-doubt instruction," *id.,* and (7) "erroneous deprivation of the right to counsel of choice," *United States v. Gonzalez–Lopez,* 548 U.S. 140, 150, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006). The Court has declined to find that even serious trial errors are structural errors. *See, e.g., Neder,* 527 U.S. at 8, 119 S.Ct. 1827 (holding "jury instruction that omits an element of the offense" was not structural error); *Arizona v. Fulminante,* 499 U.S. 279, 311, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (holding "admission of an involuntary confession" was not structural error).

proper sentencing evidence, then reversal is "mandated" without regard for whether the error was harmless. *See, e.g., State v. Hausner*, 230 Ariz. 60, 280 P.3d 604, 628 (2012); *State v. Gregory*, 158 Wash.2d 759, 147 P.3d 1201, 1273 (2006). These decisions have been driven by Justice Scalia's use of the language "mandate reversal" in describing the effect of the due-process violation. *Brown*, 546 U.S. at 221, 126 S.Ct. 884.

But there was no express holding in *Brown* that a new category of structural error had been created. While there is some language in *Brown* discussing the harmless-error rule and whether it "applies" to the type of error at issue in that case, *id.* at 219 n. 3, 126 S.Ct. 884, it is clear that the real question was whether harmless-error review is mandatory or could be avoided by finding that there was *no* error. *See id.* (discussing issue that "harmless-error review is *necessary*" in states whose sentencing statutes require that the jury find that aggravating factors outweigh mitigating factors, referred to as "weighing" states) (emphasis added). The four dissenting justices believed that a reviewing court must proceed to harmless-error review because there was, indeed, constitutional · error, *e.g.*, *id.* at 239, 126 S.Ct. 884 (Breyer, J., dissenting), but the majority simply concluded there was no constitutional error in the case and thus no need to engage in harmless-error review, *id.* at 219, 126 S.Ct. 884. When all of the opinions in *Brown* are considered, there is no real suggestion that a reviewing court cannot do harmless-error review if it finds

a constitutional error stemming from the improper admission of evidence in aggravation.

And in at least one other case, *Tuggle v. Netherland*, the Court has remanded a case with an error like the one in this case—where the jury is allowed to consider improper evidence in aggravation—for possible harmless-error review. *See Tuggle v. Netherland*, 516 U.S. 10, 14, 116 S.Ct. 283, 133 L.Ed.2d 251 (1995); *see also id.* at 15, 116 S.Ct. 283 (Scalia, J., concurring) (stating clearly that "remand is appropriate to allow the Fourth Circuit to review the case under the harmless-error standard"); *see also Jennings v. McDonough*, 490 F.3d 1230, 1256 (11th Cir.2007) (*"Brown* ... deals only with the threshold matter of deciding when constitutional error has resulted from reliance on invalid aggravators, not with how appellate courts can remedy the error short of resentencing."). And this aspect of *Tuggle* was cited with approval in *Brown*. *See Brown*, 546 U.S at 219, 126 S.Ct. 884 (citing *Tuggle*, 516 U.S. at 13–14, 116 S.Ct. 283).[22]

▮▮▮ We conclude that harmless-error review is appropriate in this case. The bar for finding harmless constitutional error, however, is much higher than for other errors. "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24, 87 S.Ct. 824; *see also Brecht v. Abrahamson*, 507 U.S. 619, 622, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)

---

**22.** That *Brown* does not bar application of the harmless-error rule (and instead only holds that application of the rule is not necessary because there is no error) is further supported by language in the opinion suggesting that it was intended to do away with the weighing/non-weighing distinction. *See Brown v. Sanders*, 546 U.S. 212, 219, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006) ("This weighing/non-

weighing scheme is accurate as far as it goes, but it now seems to us needlessly complex and incapable of providing for the full range of possible variations."). The harmless-error rule has always been applicable to weighing states; in fact, its use was mandatory, if the court was to affirm, if the jury considered an improper aggravating factor. *Id.* at 217, 126 S.Ct. 884.

("[T]he standard for determining whether a conviction must be set aside because of federal constitutional error is whether the error 'was harmless beyond a reasonable doubt.'"). This requires "prov[ing] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24, 87 S.Ct. 824. And "[t]he State bears the burden of proving that an error passes muster under this standard." *Brecht v. Abrahamson*, 507 U.S. at 630, 113 S.Ct. 1710.

■ We believe that burden has been met in this case. Lisa Hill's testimony occupied only twelve minutes out of almost four days of proof. She briefly described her deceased husband's personality and the work he did, and she did so in a calm manner. And while this testimony would naturally evoke a sympathetic response, the jury had also heard how St. Clair had been incarcerated in Oklahoma awaiting sentencing for *two* other murders when he escaped with Dennis Reese (and that he had been awaiting trial for yet another *two* murders for which he was later convicted), that St. Clair and Reese had kidnapped and murdered Keeling, and that they had kidnapped and murdered Frank Brady execution-style. That proof included evidence about the events leading up to and the wrenching circumstances of Frank Brady's kidnapping and murder, and proper victim-impact testimony from Frank Brady's daughter, Michelle Brady Walker. The jury also heard testimony that St. Clair had claimed that killing people was like killing dogs and that it was easy after the first one. And the jury heard from St. Clair himself, who readily admitted to the *four* previous murders in Oklahoma, going so far as to claim that his victims, who he claimed were killers and drug dealers, deserved to be killed. He also bragged that he had bribed jailers in Oklahoma to give

him special treatment (such as a personal television) and, eventually, to allow him to escape.

Though Hill's testimony was not relevant to whether St. Clair should receive the death penalty for murdering Frank Brady, it paled in comparison to the other evidence, both in length and nature. The relative brevity of Hill's testimony favors this Court's finding it harmless, even under the constitutional-error standard. *See Cantu*, 939 S.W.2d at 637 (noting "sparsity" of improper victim impact evidence and holding harmless); *Sherman v. State*, 114 Nev. 998, 965 P.2d 903, 914 (1998) (holding error harmless because the "testimony was limited to only a few statements regarding the previous victim's standing in the community"); *Dunlap*, 975 P.2d at 746 (holding harmless "three isolated illustrations of emotional reactions that were well within the predictable norm of human responses to crimes such as aggravated robbery" because their "impact is de minimis").

Moreover, the jury instructions did not mention, much less emphasize the improper victim-impact evidence. *Cf. Zant*, 462 U.S. at 889, 103 S.Ct. 2733 (agreeing error had "an inconsequential impact on the jury's decision regarding the death penalty" because jury instructions did not emphasize it and required jury to consider all evidence, facts, and circumstances of case).

In light of the large amount and nature of the other evidence against St. Clair, and the nature and short duration of Hill's testimony, this Court is convinced beyond a reasonable doubt that Hill's testimony did not contribute to the jury's death-penalty verdict. There can be no reasonable doubt that this one victim is not what swayed the jury to impose the death penalty. Thus, this Court' concludes that the error in this case fits within the narrow category of constitutional errors that are harmless. Indeed, the circumstances of

this case illustrate exactly why the harmless-error rule should apply to the type of error encountered in this case.

**7. The evidence of St. Clair's other murders and of other crimes was not reversible error.**

St. Clair also claims that the prosecution introduced overly detailed proof of his prior crimes in violation of KRS 532.025, KRS 532.055, and *Mullikan v. Commonwealth*, 341 S.W.3d 99 (Ky.2011). This includes proof related to the four Oklahoma murders and the murder of Tim Keeling, which will be addressed separately.

**a. Evidence of the Oklahoma murders was not reversible error.**

The evidence that St. Clair complains about consists of some details of the four murders in Oklahoma that preceded his escape from jail there, all of which were elicited on cross-examination of St. Clair. The first two murders were of Ronnie St. Clair (the Appellant's uncle) and William Kelsey, Jr.; St. Clair had been convicted for these murders and he was awaiting sentencing when he and Reese escaped from jail. St. Clair was not tried for the other murders (of Mary Smith and Ed Large) until 1994. St. Clair specifically complains that the Commonwealth admitted evidence of the following details of these murders: that St. Clair had shot both Mary Smith and Ed Large in the head; that Ronnie St. Clair had witnessed these shootings, thus giving St. Clair (the Appellant) a motive to kill him; that St. Clair (the Appellant) had hired Kelsey to kill Ronnie St. Clair for $500 after Ronnie had tried to hire Kelsey to kill St. Clair (the Appellant); that St. Clair had killed

Kelsey the next night; that Kelsey had been a contract killer who worked for the local sheriff; and that St. Clair (the Appellant) and Ronnie St. Clair were drug dealers, even though drug charges against St. Clair were eventually dropped. He also complains that he was asked whether it was "hard" to kill Mary Smith, which St. Clair allegedly understood as technically difficult, rather than emotionally difficult, and that he answered in the negative.

This issue is completely unpreserved and thus is addressable only under the *Sanders* standard. *See Sanders*, 801 S.W.2d at 668.

The focus of the first prong of *Sanders* is whether the failure to object might have been a legitimate trial tactic.[23] But, having reviewed the record, it is clear that all of this information came from St. Clair himself on cross-examination, and played into the strategy or series of strategies used at the retrial.

At the retrial, St. Clair aggressively claimed that the story he was then telling, in which he denied any participation in Reeling's or Brady's murders, was true, as opposed to the story he told in the 1998 trial (several items of which, such as his claim to never have been in Kentucky, had been proven false). He also downplayed the significance of his prior murder convictions, which would serve as the basis of the jury's finding an aggravating factor to support a death sentence. To further this strategy, he readily admitted his previous murders in Oklahoma but painted those victims as evildoers who deserved to be killed. This was in contrast to his claim that he had nothing to do with the murders of Keeling or Brady, since they were

---

**23.** The Commonwealth argues that all of this proof was proper because this Court has previously approved detailed evidence of St. Clair's Oklahoma crimes under KRE 404(b). The 404(b) evidence that this Court allowed, however, was not proof of the four Oklahoma murders, but was instead proof of the escape from jail in Oklahoma, and the criminal conduct that followed. *See St. Clair v. Commonwealth*, 140 S.W.3d 510, 535–36 (Ky.2004).

innocent people. This contrast was also an attempt to show that he was now telling the truth, since admitting the prior murders could give him an air of credibility, and an attempt to distance himself from his prior alibi testimony (where he claimed not to have been in Kentucky), since other proof now undermined that alibi.[24]

Very little of this information was asked about directly; most of it was volunteered by St. Clair, either in unresponsive answers or in attempts to explain his answers on cross-examination. St. Clair characterized his own testimony at the 2011 re-trial as his telling "this story" for the first time; he stated that it was "the truth," as opposed to what he testified to in the 1998 trial.[25]

That St. Clair's overall strategy was to claim he was telling the truth for the first time in the 2011 trial became apparent during his direct examination, when he admitted to firing at the state trooper. He claimed he did this only to disable the vehicle and further his escape, not to kill the trooper. In almost the same breath, he denied having had a part in Keeling's or Brady's murders. This was the beginning of a pattern in his testimony, whereby he paired admissions to lesser crimes or crimes for which he had already been convicted with claims of no involvement in the Keeling and Brady murders.

 It was on cross-examination, however, when his answers began to focus on this strategy. He began by admitting that he was retracting his false alibi, which he'd only testified to in 1998 on the advice of previous counsel.[26] The conversation then turned to the four Oklahoma murders, where the information about which St. Clair now complains came out.

That information, which went into the details of the other murders and crimes for which St. Clair has not been convicted, appears erroneous. *See, e.g., Mullikan,* 341 S.W.3d at 109 (limiting evidence of prior convictions to a general description of the elements). And on first blush, it would appear inflammatory.

However, knowing that the information came from St. Clair himself and considering the context of questions and answers in which the information was revealed, it is easy to see that the information played into the defense strategy on retrial, which would explain why defense counsel did not object.

24. This proof included telephone calls from Kentucky and fingerprints. St. Clair even admitted on the stand that this information contradicted his prior alibi testimony.

25. For example, after discussing the murders of Ed Large and Mary Smith, he gave the following monologue in response to a question:

This is the first time before any jury that I have ever, out of all of us here, ever, that I have ever told this true story about what we are about. Drug dealers. And drug dealers, you know, learn things. I was guilty of what I done there [in Oklahoma]. But I'm not guilty of killing a man here in Kentucky, or committing no other crime than taking and shooting and disabling a state trooper's car. I did not have to kill a man to get away. And I didn't try to.

26. Several times in his testimony, St. Clair complained that his previous counsel, who had been a supervisor in a DPA office, had essentially sold him out by making a deal for Dennis Reese. St. Clair claimed that his lawyer, unbeknownst to St. Clair, had also been representing Reese. While this was not actually the case, St. Clair's claim was based on the fact that Reese's lawyer had worked in the same office, apparently under St. Clair's lawyer. According to St. Clair, after Reese made his deal, St. Clair's counsel told him (St. Clair) the only way to avoid the death penalty in Kentucky was to claim he had never been in the state. This, claims St. Clair, led to his perjured testimony at the 1998 trial.

For example, early in cross-examination, the Commonwealth asked about St. Clair having killed his own uncle, Ronnie St. Clair, despite his having previously claimed to have only killed people who harmed his family. St. Clair answered this question unresponsively by pointing out that he and his uncle had been competing drug dealers. Rather than the Commonwealth "forcing" this drug-dealer testimony from St. Clair, as he now claims, it is clear from our review of the record that he volunteered the information to prop up his new testimony. In fact, St. Clair emphasized that he was disclosing this drug information for the first time, partly to give context for some of the killings in Oklahoma. He also claimed that he should have disclosed the information at his 1998 trial, saying, "if I would've, the outcome would've been different." He also emphasized that he was telling "this jury" the truth. Almost every time the issue of drug dealing was brought up, it was by St. Clair as part of his finally telling the "truth."

After St. Clair had admitted being a drug dealer several times, the Commonwealth stated that it was "no secret" then that St. Clair was a drug dealer but that it was a "matter whether a case was going to be made ... [and] it's kind of hard to make a case on you when the witnesses keep dying." St. Clair responded, "Actually, they had me charged for selling drugs. And the OSBI [Oklahoma State Bureau of Investigation] was in on that. They did. You asked the question, let's let the jury hear it." He then went on to explain, without having been asked, how he was charged with drug trafficking in Oklahoma. This falls far short of the Commonwealth forcing St. Clair to admit to drug crimes.

Most of the information about the four Oklahoma murders was injected by St. Clair in an effort to justify or at least minimize his earlier killings by painting the victims, in his words, as "cold killers" and "drug dealers" who "in [his] eyes ... deserved it." Indeed, throughout his cross-examination, St. Clair's answers exceeded the scope of the questions asked, always under the guise of his wanting to explain the situation further. In fact, he would frequently speak over the prosecutor asking the questions, saying, for example, that the jury "might want to hear this." And he repeatedly emphasized, as he talked over the prosecutor, that he had lied in his previous trial and that he wanted to tell the truth now and to tell "this story" for the first time.

It is not surprising that St. Clair's counsel did not object to this cross-examination. The cross-examination, to the extent the questions directly touched on this allegedly bad information, gave St. Clair an opportunity to tell his "true story," and to do so under the apparent pressure of cross-examination.

Thus, this claimed error fails the first prong of *Sanders*, because there is a reasonable explanation for why St. Clair's counsel did not object. That the strategy was ineffective does not matter. Under *Sanders*, this Court cannot say that this evidence was reversible error.

### b. Evidence of Timothy Reeling's murder.

 St. Clair also complains that evidence of the details of Timothy Keeling's murder, including statements St. Clair made right after the murder that killing a person was as easy as killing a dog, was erroneously admitted.[27] Again, there was

---

**27.** This portion of St. Clair's brief also addresses the proof from Timothy Keeling's widow, Lisa Hill. That evidence is addressed above.

no objection to this proof, and thus review of it proceeds under *Sanders.*

This claimed error also fails the first prong of *Sanders* because there was a reasonable justification or explanation for defense counsel's failure to object. The complained-of proof came in by way of summaries and out-loud readings of transcripts of the testimony from the 1998 trial, and live testimony from Dennis Reese, who stayed largely consistent with his 1998 testimony.

This evidence was not proof of a prior conviction under KRS 532.055, which is limited in scope under *Mullikan.* Rather, it was part of the evidence of other bad acts that was admitted at the guilt phase of the 1998 trial. This Court upheld the admission of proof about the murder of Timothy Keeling in the guilt phase of the trial as proper evidence of other bad acts under KRE 404(b). *See St. Clair I,* 140 S.W.3d at 535–36. As discussed above, a summary of that evidence was then admissible at a re-trial of the sentencing phase. *See Jacobsen v. Commonwealth,* 376 S.W.3d 600, 612 (Ky.2012); *Boone v. Commonwealth,* 821 S.W.2d 813, 814 (Ky.1992) ("[C]ommon sense dictates that the second jury must be told something about what transpired during the earlier guilt phase if they indeed are not 'to sentence in a vacuum without any knowledge of the defendant's past criminal record or other matters that might be pertinent to consider in the assessment of an appropriate penalty.'" (quoting *Commonwealth v. Reneer,* 734 S.W.2d 794, 797 (Ky.1987))). The Commonwealth was not limited to summaries of the proof and thus properly read transcripts and used live witnesses. *See St. Clair II,* 319 S.W.3d at 311 ("[W]hile encouraging summaries for the sake of expediting re-sentencing trials, this Court does not require that summaries always be presented in lieu of live testimony, reading transcripts of prior trial testimony, or playing videotapes of prior trial testimony.").

A lawyer knowing that this proof was admissible would not have wasted an objection on it. This evidence was not reversible error.

**8. The Commonwealth's questions leading St. Clair to call witnesses liars, wrong, or mistaken were not reversible error.**

St. Clair also claims that the trial court erred by allowing the Commonwealth to force him to characterize other witnesses as liars. He specifically complains that the Commonwealth forced him to claim that an Oklahoma police officer lied about him gaining weight during the escape and that Trooper Bennett's and another witness's testimony identifying St. Clair was wrong, and that he was forced to claim that his wife lied about his asking her to bring handcuffs and clothing to him after the escape. This issue is also unpreserved.

First, we must note that this proof was not from St. Clair's live testimony. Rather, it was from his testimony from one of his earlier trials, a transcript of which was read into the record for the jury. And this Court has already held that such evidence is admissible in a retrial of the sentencing phase, or at least was not an abuse of discretion. *See St. Clair II,* 319 S.W.3d at 313–14.

Second, and more importantly, St. Clair has mischaracterized the examination about which he now complains. While he did end up referring to at least some of the other witnesses as liars, he was not forced to do so as is forbidden by *Moss v. Commonwealth,* 949 S.W.2d 579 (Ky.1997).

For example, after denying having gone to Colorado with Reese, the following exchange took place:

Q: So if there was testimony from [Oklahoma State Bureau of Investigation] Agent [Perry] Unruh or from Bylynn [St. Clair's ex-wife] that you have gained a lot of weight, your recollection is that ain't true?

A: Well, it is not true.

Q: Okay. That's my question. So that would be untrue.

A: That would be untrue.

Q: Okay.

A few minutes later, the following took place:

Q: Perry Unruh said you had gained weight, and you're saying you hadn't gained weight, is that right?

A: The only weight I gained what time I laid in the Bryan County Jail, and I laid there for seventeen months. And I put a little weight.

Q: Didn't put on any weight during your escape.

A: No, sir.

Q: So if Unruh says you did, that is wrong?

A: He would be a liar.

Q: He would be a liar? Thank you.

A: He's a liar.

In *Moss*, the prosecutor "badgered" the defendant into saying the officer was a liar, asking specifically, "So Officer Wiley is lying? Is that what you're saying, Mr. Moss?" and "So you think Officer Wiley is lying if he says he didn't see anyone but you come out of that fence?" *Id.* at 583. This Court held that the error was harmless but that "such a line of questioning [is] improper." *Id.* We went on to state:

A witness should not be required to characterize the testimony of another witness, particularly a well-respected police officer, as lying. Such a characterization places the witness in such an unflattering light as to potentially un-

dermine his entire testimony. Counsel should be sufficiently articulate to show the jury where the testimony of the witnesses differ without resort to blunt force.

*Id.*

▆▆▆ In this case, St. Clair was asked whether Agent Unruh was a liar only one time—after he had already made the claim. To the extent that use of the "L word" is the only concern, St. Clair opened the door to it. He was not forced to use that word, and there is no error.

The Commonwealth's other questions fell short of using the word "liar" or "lie." Whether *Moss* applies in such circumstances is an open question. *See Duncan v. Commonwealth*, 322 S.W.3d 81, 88 (Ky. 2010) ("This appears to be a question we have not addressed before." Other courts have distinguished the two types of questions: "Asking a witness whether a previous witness who gave conflicting testimony is 'mistaken' highlights the objective conflict without requiring the witness to condemn the prior witness as a purveyor of deliberate falsehood, *i.e.*, a 'liar.'" (quoting *United States v. Gaind*, 31 F.3d 73, 77 (2nd Cir.1994))).

Like in *Duncan*, however, we do not have to decide whether the Commonwealth succeeded in properly "show[ing] the jury where the testimony of the witnesses differ without resort to blunt force," *Moss*, 949 S.W.2d at 583, or crossed the line into "comment[ing] on the credibility of another witness," *id.* (quoting *State v. James*, 557 A.2d 471, 473 (R.I.1989)), because the error alleged here was not preserved. Under the second prong of *Sanders*, St. Clair must show that he was prejudiced by this even if it was error.

▆▆▆ At least as it regards statements about St. Clair having gained weight and whether he asked his wife to bring him

handcuffs or she simply brought them of her own accord, there was no prejudice. This testimony concerned relatively minor details. While the concern in *Moss* is not that the witness's testimony about certain details would be undermined, and is instead about "plac[ing] the witness in such an unflattering light as to potentially undermine his entire testimony," *id.*, this Court cannot perceive that any of this testimony significantly altered the jury's view of St. Clair in light of the other evidence against him. This cannot have so infected the jury's perception of St. Clair as to have undermined all of his testimony.

The questioning about Trooper Bennett and the other witness, Martin Comely, identifying St. Clair was more significant but it too was not prejudicial. St. Clair was asked whether Trooper Bennett and Comely were "mistaken" or "wrong" when they identified St. Clair as being in Kentucky. This Court can discern no prejudice to St. Clair in the reading of a trial transcript in which he claimed the witnesses who identified him were wrong or mistaken, because he admitted that he lied about that at his previous trial and actually was in Kentucky. Again, even if this technically violated *Moss*, there was no danger that this line of questioning placed St. Clair in such an unflattering light as to undermine his entire testimony. Thus, there was no prejudice, as required under *Sanders* for unpreserved error in a capital case.

**9. St. Clair's marital privilege was not violated because it was waived by failure to invoke it.**

St. Clair claims that his marital privilege under KRE 504 was violated by the admission of testimony from his ex-wife, Bylynn.

Specifically, he complains of testimony from Bylynn about a phone conversation she had with St. Clair in which he asked her to bring him certain items, including a pair of handcuffs. He notes that his death sentence in another case was reversed for similar evidence, albeit concerning different conversations. *See St. Clair v. Commonwealth*, 174 S.W.3d 474, 481 (Ky.2005).

St. Clair claims this issue was preserved by his *pro se* post-trial motion to set aside his conviction and for a new sentencing trial. This, however, cannot preserve an evidentiary error for review if the error was not the subject of a contemporaneous objection. *See Patrick v. Commonwealth*, 436 S.W.2d 69, 74 (Ky.1968); RCr 9.22. There was no such objection and thus the issue was not preserved for review.

More importantly, the marital-communications privilege under KRE 504 must be invoked before it can be applicable. The marital-communications privilege is "a privilege to refuse to testify and to prevent another from testifying to any confidential communication made by the individual to his or her spouse during their marriage." KRE 504(b). The rule specifically talks of the privilege being "asserted," which can be done "only by the individual holding the privilege or by the holder's guardian, conservator, or personal representative." *Id.* And this Court has held that the two privileges under KRE 504 must be asserted to be taken advantage of, and "failure to assert the ... privilege constitutes a waiver of the privilege." *Bixler v. Commonwealth*, 204 S.W.3d 616, 631 (Ky.2006).[28]

---

28. *Bixler* was specifically about assertion of the spousal-testimony privilege under KRE 504(a), whereas St. Clair is raising the marital-communications privilege under KRE 504(b). Though *Bixler* did not say so expressly, it implied strongly that the invocation requirement applied to both privileges, having cited approvingly *White v. Common-*

Thus, we conclude that by failing to object to this evidence, St. Clair failed to invoke his marital privilege, and that he thereby waived the privilege. There was no error.

### 10. There was no prosecutorial misconduct.

St. Clair also claims that the Commonwealth engaged in multiple instances of prosecutorial misconduct. Specifically, he complains about the Commonwealth's introduction of (1) victim impact testimony about Tim Keeling (described above), (2) proof of uncharged crimes and prejudicial details of prior convictions (also described above), (3) the so-called *Moss* questions (i.e., questions asking a witness to characterize another witness as lying, also discussed above), (4) testimony from Dennis Reese not presented at the 1998 trial that supposedly enhanced his credibility, (5) and a request in closing argument for the jury to consider only death and not the rest of the penalty range. This claim is not preserved.

"Prosecutorial misconduct is 'a prosecutor's improper or illegal act involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment.'" *Noakes v. Commonwealth*, 354 S.W.3d 116, 121 (Ky.2011) (quoting *Black's Law Dictionary* (9th ed.2009)) (brackets and ellipses omitted). It "may result from a variety of acts, including improper questioning and improper closing argument." *Id.* "Any consideration on appeal of alleged prosecutorial misconduct must center on the overall fairness of the trial. In order to justify

reversal, the misconduct of the prosecutor must be so serious as to render the entire trial fundamentally unfair." *Soto v. Commonwealth*, 139 S.W.3d 827, 873 (Ky.2004) (quoting *Stopher v. Commonwealth*, 57 S.W.3d 787, 805 (Ky.2001)). For unpreserved prosecutorial misconduct to be reversible, it must have been flagrant. *Barnes v. Commonwealth*, 91 S.W.3d 564, 568 (Ky.2002).

"Issues involving the admission of evidence or testimony, when ruled upon by the trial court, do not constitute prosecutorial misconduct." *Stopher v. Commonwealth*, 57 S.W.3d 787, 806 (Ky. 2001). "Unpreserved claims of error cannot be resuscitated by labeling them cumulatively as 'prosecutorial misconduct.'" *Noakes*, 354 S.W.3d at 122 (quoting *Young v. Commonwealth*, 50 S.W.3d 148, 172 (Ky. 2001)) (bracket omitted). That is essentially what these claims are.

The first three claims are "nothing more than alleged evidentiary errors," *id.*, the merits of which we have addressed above. There is no question that "[b]ased upon our prior precedent, these allegations do not constitute prosecutorial misconduct." *Id.* Further review of them is thus unnecessary.

The fourth contention, that new testimony from Dennis Reese was misconduct, fails for similar reasons. Reese was asked, with a leading question, how long St. Clair held the muzzle of a gun to a kneeling Vernon Stephens' head when they stole his truck in Oklahoma. This testimony was not introduced in 1998. St. Clair claims this bolstered Reese's later testimo-

---

*wealth*, 132 S.W.3d 877, 882 (Ky.App.2004), which "specifically discuss[ed] the marital communications privilege." *Bixler v. Commonwealth*, 204 S.W.3d 616, 631 (Ky.2006). *Bixler* concluded that *White's* "holding that failure to assert the spousal privilege [meaning marital-communications privilege] consti-

tutes a waiver of the privilege is equally applicable to the spousal testimony privilege." In essence, *Bixler* assumed the correctness of *White's* holding that the marital-communications privilege must be invoked or be waived. This Court agrees that the invocation requirement applies to both privileges.

ny that he (St. Clair) made Frank Brady kneel down when he shot him. St. Clair cites no authority for why this new evidence was error. It fails as the basis of a claim of prosecutorial misconduct because it is, at best, an attempt to repackage an evidentiary claim as prosecutorial misconduct. *See id.* And, whatever it was, the prosecutor's asking this question was not flagrant, nor did it negatively affect the overall fairness of the trial.

The fifth claim, that the prosecutor engaged in misconduct by urging the jury to consider only the death penalty, also fails upon closer examination. St. Clair specifically claims that by asking the jury "not to consider anything but death" and saying that the other penalties were "meaningless," the prosecutor violated *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and similar cases because it was an order not to consider mitigation evidence. *Lockett* and it progeny bar a statute or jury instruction that limits the consideration of mitigating evidence. *See, e.g., id.* at 608, 98 S.Ct. 2954 ("The limited range of mitigating circumstances which may be considered by the sentencer under the Ohio statute is incompatible with the Eighth and Fourteenth Amendments. To meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors.").

■ But this was about the prosecutor's closing argument. The closing argument is not a jury instruction. An argument urging the jury to consider only the death penalty, rather than the full range of penalties, is not a command. Nor does such an argument mislead the jury about the law, and it is in no way inaccurate. *Cf. Caldwell v. Mississippi*, 472 U.S. 320, 336, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (reversing death sentence where argument misled jury about its role and that of ap-

pellate courts). It is merely a rhetorical tool aimed at persuading the jury. Indeed, it is no different than a prosecutor urging the jury to find the defendant guilty, rather than not guilty, during the penalty phase. The neutral arbiter in a criminal case, the person who is to objectively instruct the jury to consider the full range of penalties (or to consider all possible verdicts, guilty and otherwise), is the judge.

The prosecutor's argument did not mislead or "instruct" the jury, and thus was not misconduct.

**11. The trial court did not err by failing to give an "innocence of the death penalty" instruction.**

St. Clair complains that Instruction No. 5 failed to inform the jury that it retained the option not to sentence him to death regardless of the circumstances, and that it failed to explain the difference between reasonable doubt as to an aggravator and a reasonable doubt as to the whole case. Instruction No. 5, of which St. Clair only quotes the second sentence, stated:

> If you have a reasonable doubt as to the truth or existence of the aggravating circumstance listed in Instruction No. 2 (Aggravating Circumstance), you shall not make any finding with respect to it.

> If upon the whole case you have a reasonable doubt whether the defendant should be sentenced to death, you shall fix his punishment as a sentence of imprisonment.

■ As to St. Clair's complaint that this instruction did not inform the jury that it retained the option not to sentence him to death, he is technically correct. *This* instruction did not do that. Instead, that was accomplished by Instruction No. 4, which laid out all the possible sentences (a term of imprisonment, life, life without parole for 25 years, or death). That in-

struction specifically told the jury that it "may" fix St. Clair's punishment at any of those four sentences. That same instruction also stated that the jury could not sentence St. Clair to death or life without parole unless it found beyond a reasonable doubt that the aggravating circumstance was "true in its entirety." This made clear the jury's options, including that it could give a penalty less than death under any circumstance. While it would not hurt to expressly charge the jury that it may choose not to impose death even if it found the existence of aggravating factors, *see Parrish v. Commonwealth,* 121 S.W.3d 198, 206–07 (Ky.2003) (approving such instructions), *overruled on other grounds by Brown v. Commonwealth,* 313 S.W.3d 577 (Ky.2010), the failure to do so is not error if the jury is otherwise properly instructed, as it was here.

▪■ As to the complaint that the instruction does not explain the difference between reasonable doubt as to the aggravator versus the entire case, it is clear that the entire instruction, of which St. Clair quotes only part, does exactly that. The instruction is plainly worded, and informs that jury that if it has a reasonable doubt as to the aggravator or as to the whole case, it may not impose death. Also, this Court has approved this very instruction in *Parrish,* 121 S.W.3d at 207; *see also Meece v. Commonwealth,* 348 S.W.3d 627, 719 n. 55 (Ky.2011); *Hunt v. Commonwealth,* 304 S.W.3d 15, 50 (Ky.2009); *Perdue v. Commonwealth,* 916 S.W.2d 148, 168 (Ky.1995).[29] The instruction was not erroneous.

**29.** This Court has recently stated that the instruction concerning reasonable doubt as to the whole case is not required by statute and thus should not be given to capital juries. *See*

**12. Instruction No. 2 does not require reversal.**

St. Clair also argues that the jury instructions allowed the jury to presume that the aggravator was true, thereby shifting the burden of proof to him. He notes that Instruction No. 2 states that the jury "shall consider the following aggravating circumstance which you may believe from the evidence beyond a reasonable doubt to be true." He argues that the word "may" gives the jury permission to go ahead and believe that the aggravator is true, and that this error is amplified by the lack of a comma before the word "which," which makes it a restrictive clause limiting its meaning.

■ St. Clair claims this alleged error is partially preserved, but it is not. Instruction No. 2 is identical to an instruction tendered by St. Clair. That another of his tendered instructions talked about the government having the burden of proof is insufficient to preserve this claim of error. St. Clair cannot claim he was prejudiced by the giving of an instruction that he requested.

**13. The trial court did not err by not defining "reasonable doubt."**

St. Clair also claims that the trial court's failure to define "reasonable doubt" violated his due-process rights. This Court has repeatedly held that the term "reasonable doubt" should not be defined. *See Smith v. Commonwealth,* 410 S.W.3d 160, 169 (Ky.2013); *Gall v. Commonwealth,* 607 S.W.2d 97, 110 (Ky.1980); *Smith v. Commonwealth,* 599 S.W.2d 900, 911 (Ky.1980); *see also* RCr 9.56(2) ("The instructions should not attempt to define the term 'reasonable doubt.' "). The rule was adopted in response to *Taylor v. Kentucky,* 436 U.S. 478, 487–90, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978), which criticized our previous

*Brown v. Commonwealth,* 313 S.W.3d 577, 594 n. 2, 3 (Ky.2010). The giving of such an instruction, however, does not prejudice the defendant and does not require reversal.

definition of the phrase. We are not inclined to revisit the rule, especially in a case like this one where the defendant did not even propose a definition to the trial court. At the very least, there was no error here.

**14. Failure to require the jury to make findings as to "non-statutory" aggravating circumstances was not error.**

St. Clair also claims that his Sixth Amendment right to a jury trial was violated when the jury was not required to make findings as to non-statutory aggravators it considered in imposing the death penalty. He notes that the jury, in Instruction No. 1, was told that it would receive evidence from which it was to determine whether there were "aggravating circumstances bearing upon the question of punishment," and, in Instruction No. 4, was told that it had to state "in writing" if it found "the aggravating circumstance to be true beyond a reasonable doubt." He claims that Instruction No. 1's use of the plural "circumstances" was acceptable, despite there being only one statutory aggravating factor listed in the other instructions, because Kentucky juries are allowed to give the death penalty for non-statutory aggravators under *Jacobs v. Commonwealth,* 870 S.W.2d 412, 419 (Ky.1994).

First, this is arguably a misreading of *Jacobs.* While the other crime for which Jacobs was convicted was attempted rape, the jury in that case found a statutory aggravator, namely that the murder was committed "while the offender was engaged in the commission ... rape in the first degree." *Id.* at 419–20 (quoting KRS 532.025(2)(a)2.). Nevertheless, in *Harris v. Commonwealth,* 793 S.W.2d 802 (Ky. 1990), this Court allowed the consideration of nonstatutory aggravating factors for the purpose of determining eligibility for an aggravated penalty (in that case, life without parole for 25 years).

But KRS 532.025(3) limits the imposition of the death penalty to those situations in which the jury finds the existence of one of the eight statutory aggravating factors listed in KRS 532.025(2). As discussed above, these are the only factors that can make a defendant eligible for the death penalty. Other aggravating circumstances are properly considered only in determining whether to impose the death penalty. And regardless of what *Harris* and *Jacobs* say, later cases specifically require the jury to find one of the statutory aggravating circumstances, an "eligibility factor," before the defendant can be sentenced to death. *See Meece v. Commonwealth,* 348 S.W.3d 627, 727 (Ky.2011); *Young v. Commonwealth,* 50 S.W.3d 148, 162 (Ky.2001). *Meece* and *Young* properly articulate the law.

 Second, the only written finding that the jury must find is the statutory eligibility aggravator from KRS 532.025(2)(a). KRS 532.025(3) does not require any and all factors considered by the jury in imposing sentence to be listed in writing on the verdict form. Rather, the statute requires only that the jury state in writing the aggravating factor that it finds that makes the defendant death eligible. The requirement that the jury state in writing the aggravating factor it finds before imposing death is to meet the constitutional requirement of allowing death only under certain extreme circumstances defined by the legislature. *See Tamme v. Commonwealth,* 759 S.W.2d 51, 55 (Ky. 1988); *see also Zant v. Stephens,* 462 U.S. 862, 876, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (noting that approval of Georgia's capital sentencing procedure rested primarily on two features, one of which was "that the jury was required to find at least one valid statutory aggravating circumstance and to identify it in writing").

That, however, does not limit the jury's consideration only to the statutory aggravator in then deciding whether to impose the death penalty. The statutory aggravator must be found to be sure that the defendant fits into the "narrow[ ] . . . category of persons convicted of murder who are eligible for the death penalty." *Zant*, 462 U.S. at 875, 103 S.Ct. 2733.

In deciding *whether* to give the death penalty, the jury has a great deal of discretion:

> Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment. Indeed, the sentencer may be given unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty.

*Tuilaepa v. California*, 512 U.S. 967, 979–80, 114 S.Ct. 2630, 129 L.Ed.2d 750, (1994) (citations, quotation marks, and ellipsis omitted); *see also Zant*, 462 U.S. at 878, 103 S.Ct. 2733 ("[T]he Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death."); *id.* at 880, 103 S.Ct. 2733 ("the absence of legislative or court-imposed standards to govern the jury in weighing the significance of . . . aggravating circumstances does not render the . . . capital sentencing statute invalid").

Simply put, "the Constitution does not require a State to adopt specific standards for instructing the jury in its consideration of aggravating and mitigating circumstances." *Zant*, 462 U.S. at 890, 103 S.Ct. 2733. And Kentucky has not adopted such a scheme, though it has iden-

tified the types of proof that are acceptable at sentencing. *See, e.g.,* KRS 532.055. Under that approach, when deciding whether to impose the death penalty, the jury is allowed to consider all of the evidence presented at trial, such as proper victim-impact evidence, in deciding on the punishment, *see Payne v. Tennessee,* 501 U.S. 808, 824, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), and may weigh the aggravating and mitigating factors as it sees fit. There is no requirement that the jury weigh the factors in any particular way. *Tuilaepa,* 512 U.S. at 979, 114 S.Ct. 2630 ("A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision."). The jury need not make specific findings as to which elements of evidence it relies on, so long as the verdict makes clear that the jury found a legitimate statutory aggravator making the defendant eligible for the death penalty.

The jury instructions in this case properly guided the jury's consideration and ultimate decision under the law of Kentucky. Instruction No. 4 stated that the jury could not impose death unless it found the existence of the aggravator listed in Instruction No. 2. And that instruction listed as an aggravating circumstance that the offense of murder was "committed by a person with . . . a prior record of conviction for a capital offense," which is specifically allowed as an aggravating factor by KRS 532.025(2)(a)1. The jury's verdict also listed that aggravating circumstance in writing. That was the initial determination of whether St. Clair fell within the narrow class of defendants who are eligible for the death penalty. That is the only specific finding that is required before the jury could then impose death.

Similar arguments have been roundly rejected by this Court. *See, e.g., Meece v. Commonwealth,* 348 S.W.3d 627, 720 (Ky.

2011) (finding "no merit" to a claim "that it was error to fail to include an instruction requiring the jury to make findings concerning non-statutory aggravators"). There is no error.

**15. The jury instructions adequately guided the jury's consideration of mitigating evidence and circumstances.**

St. Clair also claims that the jury instructions were erroneous because they failed to explain the mitigating circumstances, including the role of pity, sympathy, and mercy, and failed to specify a standard of proof for mitigation.

To the extent that St. Clair's argument is that the instructions failed at all to instruct on mitigation, he is simply wrong. Instruction No. 3 read as follows:

> In fixing the sentence for the Defendant for the offense of MURDER, you shall consider mitigating or extenuating facts and circumstances as have been presented in the evidence as you believe to be true. You shall consider those aspects of the Defendant's character, and those facts and circumstances of the particular offense of which he has been found guilty, which you believe from the evidence to be true. If you believe it to be true you shall additionally consider the following:
> (1) Whether the defendant was an accomplice in the offense committed by another person and his participation in the offense itself was by comparison relatively minor;
> AND/OR
> (2) Any other circumstance or circumstances arising from the evidence which you, the Jury, deem to have mitigating value.

These instructions allowed the jury to consider any mitigating circumstances raised by the evidence, and imposed no limit on their consideration, thus complying with *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ("[T]he Eighth and Fourteenth Amendments require that the sentence ... not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."). The jury under this instruction could consider St. Clair's difficult childhood and the affection that St. Clair's ex-wife and other witnesses bore for him, as he now suggests they needed to do. *See Eddings v. Oklahoma,* 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (noting that "[e]vidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation").

■ The law does not require that "mitigating circumstances" be defined, *Tamme v. Commonwealth,* 973 S.W.2d 13, 37–38 (Ky.1998), nor does the law require that the jury be told specifically that it must consider the role of pity, sympathy, and mercy. These concepts are implicit in the instruction allowing consideration of mitigating and extenuating circumstance.

■ St. Clair's argument that the jury should have been instructed on the burden of proof is also not well taken. He claims that the jury should have been instructed "to find mitigation ... if it was supported by 'any evidence' or a 'preponderance of the evidence,' or 'if you believe [it] to be true.'" (Brackets in original.) The instruction did exactly that when it told the jury repeatedly to consider mitigation that it "believed to be true." Moreover, because "a jury is not required to make findings with regards to mitigators, but only to consider them, there is no need to define the standard of proof." *Tamme,* 973 S.W.2d, at 38. There is no error.

**16. The jury instructions did not require the jury to unanimously find the existence of mitigating circumstances.**

St. Clair claims that Instruction No. 3, quoted above, erroneously required the jury to find mitigating factors unanimously. This is a truly semantic claim, turning on the use of the word "you" in arguably two different manners in the mitigation instruction. The instruction states in several places that "you" shall consider all mitigating circumstances, which St. Clair claims would allow individual jurors to find mitigation. But at the end of the instruction, it says "you, the Jury." St. Clair claims this latter use requires the entire jury to agree on what is mitigating because another instruction states that "the verdict of the Jury" must be unanimous.

St. Clair relies on *Mills v. Maryland*, 486 U.S. 367, 380, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), which requires that less than all the jurors be able to consider mitigation (e.g., a single hold-out cannot bar the other jurors from considering a certain mitigating factor). But the instructions in *Mills* differed considerably from those here in that they propounded a series of interrogatories about different mitigating factors to the jury, which had to mark "yes" or "no." There, a single hold-out would have required the jury to mark "no" to indicate it had not considered that fact. The instructions in this case simply lay out what the jury is to consider, and then they return their verdict as to sentence.

This Court has repeatedly rejected similar arguments in the past, holding that this instruction does not imply that mitigating circumstances must be found unanimously. *See, e.g., Meece*, 348 S.W.3d at 719–20; *Hunt v. Commonwealth*, 304 S.W.3d 15, 50 (Ky.2009); *Bowling v. Commonwealth*, 873 S.W.2d 175, 180 (Ky.1993). Also, the Sixth Circuit has apparently[30] upheld our instructions in light of a *Mills*-based attack. *See Kordenbrock v. Scroggy*, 919 F.2d 1091, 1120–21 (6th Cir.1990). The argument is no more compelling today.

In a new twist on this argument, however, St. Clair also cites an ABA death penalty study showing that many capital jurors do not understand that aggravators have to be found beyond a reasonable doubt, and that a majority of those interviewed erroneously believed that mitigation had to be proved beyond a reasonable doubt and that they had to be unanimous in finding mitigation. *See* American Bar Ass'n, *Evaluating Fairness and Accuracy in State Death Penalty Systems: The Kentucky Death Penalty Assessment Report* 308 (2011).[31] While that weighs possibly in favor of clarifying the instructions overall—perhaps by just stating simply that each juror may consider mitigating evidence individually and that mitigating evidence does not have to be proven beyond a reasonable doubt—it does not render *this* instruction erroneous. As we have previously found, "considering the instructions given, 'there is no reasonable possibility that the jury misunderst[ood] its role in the capital sentencing procedure or misunderst[ood] the meaning and function of mitigating circumstances.'" *Meece*, 348 S.W.3d at 720 (quoting *Peek v. Kemp*, 784 F.2d 1479, 1494 (11th Cir.1986)); *see also*

---

**30.** The decision in question is an unusual *en banc* decision with no less than ten separate opinions. The controlling holding (with 9 of 13 votes) with respect to our instruction appears in part of a *dissent. See Kordenbrock v. Scroggy*, 919 F.2d 1091, 1121 (6th Cir.1990) (Kennedy, J., dissenting).

**31.** This report is available at http://www.americanbar.org/content/dam/aba/administrative/death_penalty_moratorium/final_ky_report.authcheckdam.pdf.

*Peek,* 784 F.2d at 1494 ("there is no reasonable possibility that the jury misunderstood its role with respect to mitigating circumstances"). There is no error.

**17. Written mitigation findings are not required.**

 St. Clair also argues that the failure of the instructions to require written findings as to mitigation violated KRS 532.025 and the Eighth and Fourteenth Amendments. Not only is the argument completely unpreserved, it is meritless, having been repeatedly rejected by this Court. *See, e.g., Meece,* 348 S.W.3d at 720; *Hunt,* 304 S.W.3d at 51. We "find no compelling need to reconsider this settled issue." *Hunt,* 304 S.W.3d at 51. It is worth noting, however, that the case on which St. Clair relies, *Proffitt v. Florida,* 428 U.S. 242, 258, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), does not, as he suggests, require written mitigation findings. Not only is the opinion from which St. Clair quotes a plurality of only three justices, it at most stands for the proposition that a system incorporating written mitigation findings, among other things, satisfies the Constitution. Such findings are a sufficient condition for constitutionality, not a necessary one. The failure to require such findings here was not error.

**18. Neither the jury nor the judge was improperly channeled in sentencing.**

St. Clair also argues that the jury and the judge were not properly channeled in sentencing him to death. Specifically, he claims that the verdict forms channeled the jury away from mitigation and toward a verdict of death, and that the trial judge's role in sentencing was undefined and unarticulated, and sentencing was ultimately in the trial judge's unguided discretion.

 His complaint as to the jury focuses on the fact that different verdict forms were provided for different sentences, one for a term of years, one for a life sentence, and one for aggravated penalties (death or life without parole for 25 years). Once again, we have previously rejected similar arguments. *See Meece,* 348 S.W.3d at 721. As in *Meece,* the instructions telling the jury that it was to choose from among the four different types of penalties, and the instruction telling it that it could not impose death (or life without parole for 25 years) without finding the existence of the aggravating circumstance, adequately channeled the jury.

St. Clair cites *Thomas v. Commonwealth,* 864 S.W.2d 252, 264 (Ky.1993), as standing for the proposition that a single verdict form should have been used. *Thomas* actually stands for the exact opposite. In that case, the jury could only find the existence of an aggravating factor by signing one of the verdict forms for an aggravated penalty, which would channel the jury into one of the aggravated penalties. Thus, the Court instructed that proper verdict forms would allow the jury to find the existence of an aggravator on a different form from that imposing sentence.

Of course, St. Clair does not complain that a single verdict form was used in this case to allow the jury to find the aggravator and to impose an aggravated sentence, though they were, in fact, on a single form in this case. Nevertheless, the verdict forms were not error in this case, despite arguably not conforming to *Thomas,* as other aspects of the instructions sufficed to properly channel the jury, such as the part of Instruction No. 4 telling the jury it could not impose an aggravated sentence unless it found the aggravating circumstance beyond a reasonable doubt and the part of Instruction No. 5 telling the jury not to make a finding with respect to the aggravating factor if it had a reasonable

doubt. This instruction clearly limited the jury's imposition of death. And that is why this Court has upheld the use of such instructions in recent cases, *see, e.g., Meece,* 348 S.W.3d at 722; *Soto v. Commonwealth,* 139 S.W.3d 827, 872 (Ky.2004), and stated that such instructions, even if imperfect, do not constitute reversible error, *see Foley v. Commonwealth,* 942 S.W.2d 876, 888–89 (Ky.1996).

As for his claim that the trial court's discretion was erroneously unchanneled, St. Clair cites only *Matthews v. Commonwealth,* 709 S.W.2d 414, 423 (Ky.1985), in which this Court stated that "the statutory scheme not only permits, but anticipates, that the trial court will play a separate, and different role in sentencing in capital cases after the jury's verdict has been received." He then suggests that this Court had not identified how the trial court's discretion is to operate.

This argument and its variations have been rejected by this Court on multiple occasions. *See Caudill v. Commonwealth,* 120 S.W.3d 635, 678–79 (Ky.2003) (rejecting this exact *Matthews*-based argument); *Epperson v. Commonwealth,* 197 S.W.3d 46, 57 (Ky.2006) ("The contention that there is no properly articulated standard of review for the trial judge in such a circumstance is without merit."); *Bowling v. Commonwealth,* 942 S.W.2d 293, 306 (Ky.1997).

**19. St. Clair was not entitled to jury instructions outlining how the death penalty would be carried out or the likelihood of his getting paroled on a sentence of less than death.**

 St. Clair also complains that the jury should have been instructed that a death sentence would be carried out by electrocution or lethal injection, and that the jury should have been instructed that St. Clair would almost certainly serve his entire sentence if given life or a term of

years. These arguments have been repeatedly rejected by this Court. *See, e.g., Meece,* 348 S.W.3d at 722; *Bowling,* 942 S.W.2d at 306 ("Such an instruction is not required by law and its omission cannot be considered error. A jury selecting death as a sentence must be presumed to know that death will be the result of that sentence."); *Fields v. Commonwealth,* 274 S.W.3d 375, 417 (Ky.2008) ("[P]arole eligibility information which is fully admissible under KRS 532.055 has no place in a death penalty hearing pursuant to KRS 532.025. Under no circumstances should parole eligibility enter into death penalty deliberations." (quoting *Perdue v. Commonwealth,* 916 S.W.2d 148, 164 (Ky.1995))), *overruled in part on other grounds by Childers v. Commonwealth,* 332 S.W.3d 64 (Ky.2010).

**20. Neither the jury nor the trial court relied on invalid sentencing factors.**

St. Clair also complains that the trial court and jury relied on invalid sentencing factors. Specifically he complains that the trial court, at final sentencing, stated that in addition to the two Oklahoma murders for which St. Clair had been convicted at the time of Frank Brady's murder, it was also considering the other two Oklahoma murders (for which St. Clair had not been convicted at the time of Brady's murder) and the murder of Timothy Keeling (for which St. Clair had not even been convicted at the time of the 2011 sentencing).

In support of this position, St. Clair relies on *Brown v. Sanders,* 546 U.S. 212, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006). That case and its implications have been discussed at length above in Section II.B.6. St. Clair notes correctly that *Brown* held that "[a]n invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element

to the aggravation scale in the weighing process unless one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." *Id.* at 220, 126 S.Ct. 884 (footnote omitted).[32]

 It appears that St. Clair misunderstands *Brown,* and runs death-eligibility factors together with selection factors. He has not identified an invalid sentencing factor, "whether an eligibility factor or not," *id.,* at least in the context of this argument.[33] He assumes, incorrectly, that evidence of the two murders for which he had not yet been convicted when he escaped from jail in Oklahoma and the murder of Timothy Keeling were erroneously admitted. Both categories of evidence, however, were admissible at his retrial. *See St. Clair I,* 140 S.W.3d at 571 (holding all four Oklahoma murders "admissible at the capital sentencing phase pursuant to KRS 532.025(*l* )(a)" even if they could not be used to support the statutory eligibility aggravating factor); *id.* at 535 (holding evidence of Reeling's murder admissible). Two of the Oklahoma murders and the murder of Keeling could not be used to make St. Clair eligible for the death penalty, but the jury instructions did not allow that. Instead, the instructions limited the jury's consideration to the proper convictions (the ones for which he had already been convicted when he killed Frank Bra-

dy) in determining whether St. Clair was eligible for death.

Though those murders could not be used to make St. Clair eligible for the death penalty, they were nevertheless relevant in determining whether St. Clair should, in fact, be sentenced to death. At that point, the sentencer has greater discretion. This evidence did not violate *Brown.*

**21. Kentucky's death-penalty regime is not unconstitutional.**

St. Clair also claims that Kentucky's death-penalty scheme is unconstitutional for several reasons, none of which require reversal.

**a. KRS 532.025 properly narrows the class of people eligible for death.**

 First, St. Clair argues the capital-sentencing scheme fails to narrow the class of defendants eligible for death because it allows the jury to impose the death penalty without finding one of the eight statutory aggravating circumstances listed in KRS 532.025. In support of this claim, he cites *Harris v. Commonwealth,* 793 S.W.2d 802 (Ky.1990), and *Jacobs v. Commonwealth,* 870 S.W.2d 412, 420 (Ky. 1994), which allowed the consideration of nonstatutory aggravating factors. This, he claims unhinges the Commonwealth's capital-sentencing scheme from the constitutional controls mandated by cases like *Tuilaepa v. California,* 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), many of

---

**32.** St. Clair also cites a portion of *Brown* stating that constitutional error occurs when a jury considers an invalid death-eligibility aggravating factor "if the reason for the invalidity of the eligibility factor is ... that it 'attache[s] the "aggravating" label to factors that are constitutionally impermissible or totally irrelevant to the sentencing process.' " *Brown,* 546 U.S. at 219, 126 S.Ct. 884 (quoting *Zant,* 462 U.S. at 885, 103 S.Ct. 2733) (ellipsis and brackets in original). There is no possibility that the activities St. Clair complains of—other murders—are constitutional-

ly protected, which is what this part of *Brown* was concerned with, or that those crimes are irrelevant to sentencing in the way suggested by *Brown.*

**33.** As discussed above, this Court concludes that the use of improper victim-impact evidence from a non-victim erroneously injected an invalid sentencing factor (selection factor) and evidence into this case, but that this was nevertheless harmless error.

which are discussed above. This argument has been rejected, *see Meece v. Commonwealth,* 348 S.W.3d 627, 727 (Ky.2011). As discussed above, regardless of what *Harris* and *Jacobs* say, later cases properly require the jury to find a statutory aggravating circumstance, an "eligibility factor," before the defendant can be sentenced to death. *See id.; Young v. Commonwealth,* 50 S.W.3d 148, 162 (Ky.2001). *Meece* and *Young* properly articulate the law, and to the extent *Harris* and *Jacobs* differ from this articulation, they are overruled. Moreover, the jury instructions in this case complied with this requirement, and barred the jury from imposing death unless it found the statutory aggravating circumstance to exist beyond a reasonable doubt. Indeed, the jury in this case did find a proper eligibility factor beyond a reasonable doubt.

**b. Kentucky provides sufficient statutory guidance for imposition of the death penalty.**

St. Clair also claims that Kentucky provides insufficient statutory guidance to juries. He includes a laundry list of subclaims—including that Kentucky does not require the indictment to charge the aggravator, that Kentucky permits execution of the innocent, and that there are no directions on how to consider mitigating and aggravating evidence—in support of this overall claim, "all of which we have previously rejected." *Meece,* 348 S.W.3d at 727.

As discussed above, KRS 532.025 is how Kentucky complies with *Gregg v. Georgia*

and other cases. It meets the requirements of those decisions by requiring the jury to find the defendant guilty of a crime for which death is not a disproportionate punishment (that is, a homicide), and requiring the jury to find the existence of at least one statutory aggravating circumstance, the definition of which is left up to the legislature, before imposing death. *See Epperson v. Commonwealth,* 197 S.W.3d 46, 62 (Ky.2006) ("KRS 532.025 provides sufficient statutory guidance for the imposition of the death penalty.").

■■■■■■ Again, "we repeat what we have previously held," namely: "The constitutionality of the death penalty has been repeatedly recognized. Further, KRS 532.025 provides adequate standards to guide the jury in its consideration and imposition of the death penalty. Finally, the death penalty is not imposed arbitrarily or capriciously in Kentucky." *Meece,* 348 S.W.3d at 727.

**c. Prosecutorial discretion does not make the capital-sentencing scheme inherently arbitrary.**

As do many capital defendants, St. Clair asserts that Kentucky's capital sentencing scheme is inherently arbitrary due to the discretion enjoyed by prosecutors in determining whether to seek the death penalty in a given case. We have rejected this argument previously, *see id.,* as has the U.S. Supreme Court, *see McCleskey v. Kemp,* 481 U.S. 279, 311–12, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *Gregg v. Georgia,* 428 U.S. 153, 199, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).[34]

**34.** We also reject St. Clair's slipshod attempt to use statistics to suggest unfairness and arbitrariness. He notes that approximately 35% of the people on death row in Kentucky were convicted in only two counties, and thus the "decision to impose death depends not just on what crime was committed, but on

which side of the street it occurred." Presumably, this "statistic" refers to the fact that 12 of the 33 people on death row were convicted in Jefferson County and Fayette County. This argument, of course, ignores the fact that the same two counties account for approximately 25% of the state's population and

**d. The theoretical possibility that a defendant might be innocent does not make the death penalty unconstitutional.**

St. Clair argues that because the judicial system is capable of making mistakes, the death penalty violates the mandate of *Furman v. Georgia* and other Supreme Court cases that arbitrariness and capriciousness be removed from the capital punishment regime. In support of this argument, he cites the claim on the website of the Innocence Project that at least 18 death-row prisoners have been freed based on DNA evidence.

Again, we have rejected this argument already:

> In America, courts go to great lengths to protect the innocent and we do not stop with just one review as is evidenced by the statistics cited. With this history and review of process in mind, "precedents of the [United States] Supreme Court prevent us from finding capital punishment unconstitutional based solely on a statistical or theoretical possibility that a defendant might be innocent."

*Meece*, 348 S.W.3d at 727–28 (quoting *United States v. Quinones*, 313 F.3d 49, 63 (2d Cir.2002)).

Also, we note that if a defendant could show actual innocence, there are procedural protections in place, particularly, those related to executive clemency. *See, e.g., Herrera v. Collins*, 506 U.S. 390, 411–15, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (describing how actual innocence claims can be brought in clemency or pardon petitions); *see also* Ky. Const. § 77 (giving governor power to grant pardons).

**22. St. Clair's "mental age" does not bar his execution.**

St. Clair also argues that he is ineligible for the death penalty, under the cases baring the execution of defendants who were juveniles at the time of their offenses, because he has the mental age of a child. Unquestionably, the Constitution bars the execution of any individual who was under the chronological age of eighteen at the time of the offense. *See Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). But even if the evidence supported a conclusion that St. Clair's "mental age" was "eight or nine," nothing in *Roper* suggests that the Constitution would bar the execution of an adult offender with such mental age. Indeed, we have expressly rejected this claim previously and concluded that *Roper* set only a bright-line rule based on chronological age. *See Bowling v. Commonwealth*, 224 S.W.3d 577, 584 (Ky.2006) ("[W]e conclude that *Roper v. Simmons* only prohibits the execution of those offenders whose chronological age was below eighteen at the time of the commission of the offense.").

**23. The trial judge properly considered the mitigating circumstances.**

St. Clair also claims that the trial court failed to consider mitigating circumstances at final sentencing. He notes that the trial judge's report under KRS 532.075 only states there was evidence of one mitigating circumstance, namely, that "the defendant was an accomplice in a capital offense committed by another person and his participation in the capital offense was relatively minor." Presumably, this refers to St. Clair's testimony that Dennis Reese killed Frank Brady and that St. Clair had noth-

present two of the three most densely populated areas in the state. It is unsurprising, or at least not an obvious statistical anomaly, that a large portion of the death sentences would be handed out in those areas. This argument,

without substantially more evidentiary support, is an empty one. Moreover, such proof would have to be presented to the trial court; that does not appear to have been done in this case.

ing to do with it. St. Clair acknowledges that at least two other parts of the report—a reference to St. Clair having an "anti-social" disorder and "organic" brain injury—are references to mitigating circumstances. Nevertheless, he claims that the court's abbreviated consideration was tantamount to "a refusal to consider mitigation." This, he argues, was error under *Hitchcock v. Dugger*, 481 U.S. 393, 396, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), and *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

 There is no question "that in capital cases, the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence." *Hitchcock*, 481 U.S. at 394, 107 S.Ct. 1821 (quotation marks omitted). But unlike in *Hitchcock*, there is no showing here that "the sentencing judge refused to consider ... evidence of nonstatutory mitigating circumstances." *Id.* at 398–99, 107 S.Ct. 1821. In that case, the trial court stated specifically that it considered only the statutorily elucidated mitigating circumstances. *Id.* at 398, 107 S.Ct. 1821. Here, the trial court said no such thing. As discussed above, the sentencer, whether jury or judge, is not required to expressly find or note in writing the mitigating circumstances it considered. In Kentucky, all of the circumstances, mitigating and aggravating, are to be considered.

The trial court did not limit the mitigating evidence offered by St. Clair. Like the jury, the judge heard about St. Clair's childhood and rough upbringing and his ex-wife's warm regard for him. That the trial judge's report does not list this evidence specifically does not mean that proof was not considered or was excluded from the court's consideration. The purpose of the report is to assist this Court in undertaking its statutorily mandated review of every death sentence, not to outline how

the trial court is to determine whether to impose the sentence recommended by the jury. In fact, the report is not even required to have a particular form or questions, other than what this Court requires. *See Slaughter v. Commonwealth*, 744 S.W.2d 407, 414 (Ky.1987).

 Moreover, it is clear, even from the report itself, that the trial judge gave greater consideration to mitigating evidence than St. Clair admits. For example, St. Clair claims references to his brain injury and mental issues on the report are only "glancing mention[s]," but that is incorrect. Both references came in response to part of a series of questions about whether a psychiatric evaluation was performed (yes) and whether "character or behavior disorders [were] found" (yes). If the answer is yes, the form asks the judge to "elaborate," to which the judge wrote "anti-social," and "What other pertinent psychiatric (and psychological) information was revealed?" to which the judge wrote, "organic." Also included with these questions is one about the defendant's intelligence level, which the judge marked "medium," which on the form means an IQ of 70 to 100. Later in the form, the judge answered the question "Does the defendant's physical or mental condition call for special consideration?" for which the judge marked "yes."

The trial court's consideration of mitigating circumstances satisfied the requirements of the Eighth and Fourteenth Amendments.

**24. The jury was properly allowed to consider St. Clair's prior murder convictions in deciding whether he was eligible for the death penalty.**

St. Clair also argues that the trial court erred by allowing the jury to consider the two prior convictions for the murder of Ronnie St. Clair and William Kelsey, Jr. in

deciding whether he was eligible for the death penalty. At the time of Frank Brady's murder, St. Clair had been convicted of these murders by a jury, but he had not yet been sentenced and he had not yet had an appeal. Thus, he argues, the two murder convictions were not properly "convictions" because they were not final judgments.

 This Court has previously held that such convictions cannot serve as the basis for a death-eligibility aggravating circumstance under KRS 532.025. *See Thompson v. Commonwealth*, 736 S.W.2d 319, 321 (Ky.1987). But we later overruled that decision as wrongly decided in St. Clair's first appeal. *See St. Clair I*, 140 S.W.3d at 563–70. "[F]or purposes of KRS 532.025(2)(a)(*l* ), 'prior record of conviction for a capital offense' includes a plea of guilty accepted by the trial court or a jury's or judge's verdict of guilty." *Id.* at 570. We held that this specifically includes the two murders for which St. Clair had been convicted by a jury before he killed Frank Brady. *See id.* at 571. And, in his second appeal, we reversed and remanded with instructions that the jury's consideration be specifically directed and limited to these two convictions when deciding whether one of the statutory eligibility factors had been proven. *See St. Clair II*, 319 S.W.3d at 308.

St. Clair urges us to revisit this position and to adopt either of the positions articulated by the dissenting opinions. *St. Clair I*, 140 S.W.3d at 574–75 (Cooper, J., dissent) (agreeing that *Thompson* was wrongly decided but concluding that its application to St. Clair violated the Ex Post Facto clause); *id.* at 577–78 (Keller, J., dissenting) (arguing that *Thompson* was correct). We decline to revisit that position. St. Clair's suggestion that the arguments

made in the dissents have never been fully addressed by this Court is simply incorrect; in declining to adopt the dissents' positions or results, this Court implicitly rejected them.

**25. The mitigating circumstances do not render St. Clair's death sentence arbitrary or disproportionate.**

St. Clair argues that his death sentence is arbitrary and disproportionate in light of the mitigating circumstances, including that he suffers from brain damage. To the extent this claim is distinct from the proportionality review this Court conducts under KRS 532.075, addressed below, it is addressed here separately.

The mitigation circumstances included some evidence that Dennis Reese was the shooter, that St. Clair had an extremely disadvantaged childhood, and that his ex-wife still has good memories of him. The evidence of brain damage he cites includes a competency report by an outside expert noting "indicia of underlying brain damage" and suggesting that he suffers from a "congenital impairment in [his] left cerebral hemisphere"; a report by a psychiatrist at the Kentucky Correctional Psychiatric Center noting that medical tests suggested the presence of a lesion in the left frontotemporal region and "frontal lobe dysfunction," and that he suffered from a seizure disorder; and the trial court's report under KRS 532.075 noting "organic" in response to the question about what psychiatric testing has revealed.

 St. Clair admits that this claim is not preserved for review as it was not presented to the trial court. Regardless, the mitigating evidence was presented to and considered by the jury.[35] This

---

**35.** It is unclear whether the proof of St. Clair's alleged brain damage was presented in

his most recent trial. While it was at issue in his previous trials, *see St. Clair II*, 319 S.W.3d

Court does not second-guess that decision, though it does undertake review under KRS 532.075. The consideration of mitigating circumstances by the sentencer was part of the constitutionally mandated *"individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens,* 462 U.S. 862, 879, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). But the mere existence of mitigating evidence does not render St. Clair's sentence unconstitutional or disproportionate.

**26. Cumulative error does not require reversal.**

St. Clair also claims that even if individual errors do not require reversal, the cumulative effect of those errors does. As discussed above, we have discerned only one error (the admission of Lisa Hill's testimony)[36] in the retrial and concluded that it was harmless error. That does not amount to cumulative error.

**27. Residual doubt does not bar the death sentence here.**

St. Clair also argues that residual doubt about his moral culpability supports a sentence of less than death. He notes that the KRS 532.075(1) trial-judge report includes the following question: "Although the evidence suffices to sustain the verdict, does it foreclose all doubt respecting the defendant's guilt?" In this case, the trial judge answered that question "no." This, he claims, indicates there is some residual doubt.

But "[t]he United States Supreme Court and this Court have held that residual doubt is not a mitigating circumstance for the death penalty." *Epperson v. Commonwealth,* 197 S.W.3d 46, 65 (Ky.2006) (citing *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988); *Tamme v. Commonwealth,* 973 S.W.2d 13 (Ky.1998)). More precisely, the U.S. Supreme Court has stated that while residual doubt *may* be considered by the sentencer if the state chooses to allow that consideration, there is no "suggest[ion] that capital defendants have a *right* to demand jury consideration of 'residual doubts.' " *Franklin,* 487 U.S. at 173, 108 S.Ct. 2320. The Supreme Court went on to state that its mandate that the sentencer be allowed to "consider[ ], *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense, in no way mandates reconsideration by capital juries, in the sentencing phase, of their 'residual doubts' over a defendant's guilt." *Id.* at 174, 108 S.Ct. 2320 (citation and quotation marks omitted).

 Residual doubt does not pro forma equate to reasonable doubt. Residual doubt, even if it exists, does not undermine St. Clair's death sentence.

---

at 309 (discussing brain damage as a nonstatutory mitigating circumstance), he has not cited a portion of the present record where that evidence was admitted, nor has this Court run across it. Instead, he notes that the psychiatric records detailing his brain damage were admitted in his Hardin County capital-kidnapping case, which is also on appeal to this Court, and asks that we take judicial notice of those records, as they are in our files. This proof, like the other mitigating circumstances, does not, by itself, render his death sentence disproportionate or arbitrary.

**36.** While the CBLA evidence, as discussed above, is also troubling in retrospect, it was not a trial error. Indeed, that is why it was evaluated under the "newly discovered evidence" standard of review, which differs slightly from harmless-error review. But even if it is considered an "error," it, combined with the erroneous admission of Lisa Hill's testimony, is not cumulative error requiring reversal.

## C. KRS 532.075 review.

"[I]n addition to the direct appeal," KRS 532.075(8), this Court is required to independently "review[ ] on the record" all death sentences, KRS 532.075(1). This Court must "consider the punishment as well as any errors enumerated by way of appeal." KRS 532.075(2). (The errors enumerated on appeal, aside from those touching directly on our KRS 532.075 review, have been addressed above.)

The main concern of this review is the death sentence itself. KRS 532.075(3). In undertaking the review, this Court is to determine

(a) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and

(b) Whether the evidence supports the jury's or judge's finding of statutory aggravating circumstances as enumerated in KRS 532.025(2), and

(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Our decision must address the "legal errors enumerated," and lay out "the factual substantiation of the verdict, and the validity of the sentence." KRS 532.075(8).

 Before turning to that review, however, we must address St. Clair's argument that our proportionality review under this statute violates due process. He claims, among other things, that we improperly exclude from our consideration cases in which the death penalty was not imposed, that capital defendants receive inadequate notice of the procedures used by the Court, that this Court has not articulated a standard of review, and that he is improperly denied access to the data prepared under KRS 532.075(6). We do not have to engage these claims in detail. They have been presented repeatedly to this Court, and this Court had repeatedly concluded that they have no merit. *See, e.g., Meece v. Commonwealth,* 348 S.W.3d 627, 728 (Ky.2011). "[T]he proportionality review conducted by this Court does not violate [the] due process [clauses] ... of either the Federal or State Constitution." *Epperson v. Commonwealth,* 197 S.W.3d 46, 63–64 (Ky.2006).

**1. St. Clair's sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor.**

We have reviewed the record and have determined that the death sentence in this case was not imposed under the influence of prejudice, passion, or any other arbitrary factor.

 St. Clair argues that the trial judge's report erroneously stated that the jury was instructed "to avoid any influence of passion, prejudice, or any other arbitrary factor when imposing sentence" because no such instruction was given. This mistake, however, does not mean that the jury acted under the influence of passion or prejudice.

While giving such an instruction may be the better practice, *see California v. Brown,* 479 U.S. 538, 543, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (noting that similar instruction "serves the useful purpose of confining the jury's imposition of the death sentence by cautioning it against reliance on extraneous emotional factors"), and is indeed permissible, *Fields v. Commonwealth,* 274 S.W.3d 375, 417 (Ky.2008) ("The trial court was under no duty to instruct the jury that it must not be influenced by prejudice or passion."); *Perdue v. Commonwealth,* 916 S.W.2d 148, 169 (Ky.1996), there is no requirement that such an instruction be given to the jury. Review for passion, prejudice, or arbitrari-

ness is left to the trial court and, ultimately, this Court. *Id.* This Court is convinced that the solemnity of the proceedings and the other instructions on what evidence the jury is to consider and what findings the jury must make suffice to convey to the jury the requirement to avoid passion, prejudice, and arbitrariness. Independent judicial review is an added check against these things.

St. Clair also argues that the trial judge's report is erroneous in that it states that no evidence was presented that could have influenced the jury to be led by passion, prejudice, or arbitrariness. He points to evidence such as the testimony of Timothy Keeling's widow and Frank Brady's daughter, Dennis Reese's testimony describing the execution-style killings of Keeling and Brady, and evidence of Appellant's statement that killing a person was as easy as killing a dog. This evidence, however, was not evidence that would lead the jury to passion, prejudice or arbitrariness, but rather, such evidence, save one item, channeled the jury to consider the circumstances of St. Clair's crimes, including the effect of the crimes on Brady's daughter, and St. Clair's personal characteristics, such as his cold and calculating approach to murder. While we have concluded that Lisa Hill's testimony was erroneously admitted, we have also concluded that its admission was harmless error. As such, it did not lead the jury to passion, prejudice, or arbitrariness.

St. Clair also complains that the prosecutor injected passion and prejudice into the proceedings by eliciting inadmissible evidence, telling the jury to consider only death, and crying and getting choked up repeatedly during closing. The first two contentions are simply incorrect. We have addressed the supposedly erroneous evidence and the prosecutor's request for a sentence of death above, and neither contributed to passion or prejudice. As for the prosecutor becoming choked up and crying, we have noted: "Trials are conducted by humans, who often show indignation, anger or sadness. This does not mean that real emotion is misconduct." *Major v. Commonwealth,* 177 S.W.3d 700, 711 (Ky.2005). The prosecutor's conduct in this respect was not inflammatory, nor did it substantially prejudice St. Clair. *Id.*

**2. The evidence supports the jury's finding of statutory aggravating circumstances as enumerated in KRS 532.025(2).**

There is no question that the evidence supported the jury's conclusion that the "murder ... was committed by a person with a prior record of conviction for a capital offense." KRS 532.025(2)(a)1. The Commonwealth produced evidence of two such records of conviction—the first two murder convictions in Oklahoma.

**3. St. Clair's sentence of death is not excessive or disproportionate to the penalty imposed in similar cases.**

In deciding whether St. Clair's death sentence is excessive or disproportionate to the penalty imposed in similar cases, we have examined all the cases decided since 1970 in which the death penalty was imposed in Kentucky. We have given particular attention to those cases in which the defendant had a prior conviction for a capital offense[37] or was sentenced to death

---

37. Apparently, we have had only one other death-penalty case in which the defendant had a prior capital conviction at the time of the murder for which he received the death sentence at issue. *See Bevins v. Common-* *wealth,* 712 S.W.2d 932 (Ky.1986) (prior capital offense from 51 years before, sentenced to death for five murders). This is because most defendants convicted of a capital offense serve lengthy prison sentences, if not life in

for multiple intentional murders.[38] The reason for comparing this case to other prior-capital-conviction cases is the obvious similarity in the aggravating circumstances, as both involve murders. Though St. Clair was not convicted of multiple murders in this case, it is nonetheless appropriate to consider his case in light of those with multiple murders because he has, in fact, committed multiple murders, and that fact appropriately bears on whether his death sentence is proportionate. Indeed, we have previously made similar comparisons. *See, e.g., Foley v. Commonwealth,* 953 S.W.2d 924, 942–43 (Ky.1997) (comparing *Bevins v. Commonwealth,* 712 S.W.2d 932 (Ky.1986), a prior-capital-conviction and multiple-murder case, to a multiple-murder case).

Despite these cases, St. Clair argues that his sentence is excessive and disproportionate because other cases involving worse facts have resulted in more lenient sentences. *See Commonwealth v. Reyes,* 764 S.W.2d 62 (Ky.1989) ("heinous and infamous" murder and sodomy); *Commonwealth v. Phon,* 17 S.W.3d 106, 107 (Ky. 2000) (two execution-style murders); *Sommers v. Commonwealth,* 843 S.W.2d 879, 880 (Ky.1992) (murder of 12– and 13–year-old sisters, with accusation of sexual abuse, *1,000–year sentence* ). He also points out that his former co-defendant, Dennis Reese, did not receive the death penalty. This alleged sentencing disparity, he claims, violates equal protection.

First, it is not clear that these cases are truly comparable. For example, in *Reyes,* the death penalty was not even available because the Commonwealth entered into a plea agreement not to seek it. *Reyes,* 764 S.W.2d at 67. And in *Phon,* the defendant was a juvenile and would not, under present law, be subject to the death penalty. *Phon,* 17 S.W.3d at 107. Like in *Phon,*

prison, and thus their opportunities to commit further murders are limited. The defendant in *Bevins* had been sentenced to life in prison but was paroled more than 40 years before the murder spree that led to his death sentence. St. Clair had to escape from incarceration before he committed the murder leading to his death sentence.

**38.** Those cases, listed here as required by KRS 532.074(5) ("The court shall include in its decision a reference to those similar cases which it took into consideration."), are: *White v. Commonwealth,* 671 S.W.2d 241 (Ky. 1984) (three murders); *Harper v. Commonwealth,* 694 S.W.2d 665 (Ky.1985) (two murders); *Skaggs v. Commonwealth,* 694 S.W.2d 672 (1985) (two murders); *Matthews v. Commonwealth,* 709 S.W.2d 414 (Ky.1986) (two murders); *Halvorsen v. Commonwealth,* 730 S.W.2d 921 (Ky.1986) (two murders); *Smith v. Commonwealth,* 734 S.W.2d 437 (Ky.1987) (four murders); *Simmons v. Commonwealth,* 746 S.W.2d 393 (Ky.1988) (three murders); *Sanders v. Commonwealth,* 801 S.W.2d 665 (Ky.1991) (two murders); *Bowling v. Commonwealth,* 873 S.W.2d 175 (Ky.1994) (two murders); *Foley v. Commonwealth,* 942 S.W.2d 876 (Ky.1997) (two murders, with indictment for four more; defendant later convicted of those); *Foley v. Commonwealth,* 953 S.W.2d 924 (Ky.1997) (four murders; previously convicted of two others); *Bowling v. Commonwealth,* 942 S.W.2d 293 (Ky.1997) (two murders); *Haight v. Commonwealth,* 938 S.W.2d 243 (Ky.1997) (two murders); *Baze v. Commonwealth,* 965 S.W.2d 817 (Ky.1997) (two murders); *Tamme v. Commonwealth,* 973 S.W.2d 13 (Ky.1998) (two murders); *Hodge v. Commonwealth,* 17 S.W.3d 824 (Ky. 2000) (two murders, prior capital conviction, though not before murder committed); *Garland v. Commonwealth,* 127 S.W.3d 529 (Ky. 2003) (three murders); *Soto v. Commonwealth,* 139 S.W.3d 827 (Ky.2004) (two murders); *Wheeler v. Commonwealth,* 121 S.W.3d 173 (Ky.2003) (two murders); *Parrish v. Commonwealth,* 121 S.W.3d 198 (Ky.2003) (two murders); *Epperson v. Commonwealth,* 197 S.W.3d 46 (Ky.2006) (two murders); *Chapman v. Commonwealth,* 265 S.W.3d 156 (Ky. 2007) (two murders); *Meece v. Commonwealth,* 348 S.W.3d 627, 644 (Ky.2011) (three murders); *Dunlap v. Commonwealth,* 435 S.W.3d 537 (Ky.2013) (three murders).

Reese also received his sentence under a plea agreement.

Second, while the offenses in *Sommers* were arguably worse than that committed by St. Clair, "[l]esser sentences imposed upon other defendants by a judge or jury are not relevant in determining the validity of a death sentence or other sentence." *Meece v. Commonwealth,* 348 S.W.3d 627, 726 (Ky.2011); *see also Marshall v. Commonwealth,* 60 S.W.3d 513, 523 (Ky.2001) ("The Eighth Amendment requires only that the trial court focus on the defendant's own culpability for the crime charged, not the culpability of a codefendant."); *cf. Caudill v. Commonwealth,* 120 S.W.3d 635, 672 (Ky.2003) ("[E]vidence of a sentence imposed upon someone else, whether pursuant to plea agreement or jury verdict, is not a factor to be considered by the jury or the sentencing judge in determining the appropriate penalty for this defendant."). Rather, the concern in evaluating a death sentence is that the crime fits in with other crimes for which the death penalty has properly been imposed. This is part of making sure that the death penalty is saved for extreme murders, and is not imposed for every homicide.

As we have stated previously, this "argument is belied by the faulty premise that all heinous murders must be punished by death. To the contrary, 'a jury can reject a death sentence for any (or no) reason at all.'" *Dunlap v. Commonwealth,* 435 S.W.3d 537, 618 (Ky.2013) (quoting *Ordway v. Commonwealth,* 391 S.W.3d 762, 786 (Ky.2013)).

St. Clair's claim that sentencing disparity violated equal protection is simply wrong. It is telling that the main authority he cites for this argument is the infamous case of *Bush v. Gore,* 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), which has nothing to do with the death penalty and stated expressly that its holding "is limited to the present circumstance," *id.* at 109, 121 S.Ct. 525, that is, elections. As discussed above, the constitution mandates that capital sentencing be individualized, with a focus on the defendant and his crime. That other defendants who have committed other crimes received different sentences does not mean St. Clair's sentence violates the Constitution. Our process "does not violate ... [the] equal protection [clauses] of either the Federal or State Constitution." *Epperson,* 197 S.W.3d at 63–64.

In light of the similar cases this Court has considered and the circumstances of St. Clair's case, including evidence of the murder and of St. Clair himself, this Court concludes that the death sentence in this case is not excessive or disproportionate. For that reason, and because there is no other error requiring reversal, this Court affirms his death sentence.

### III. Conclusion

As discussed above, St. Clair's claims of error are either completely without merit or do not require reversal. This Court has reviewed the record and concluded that the jury's verdict was factually substantiated and that the sentence was valid. KRS 532.075(8). St. Clair's conviction for murder, to the extent it has been challenged in this appeal, and sentence of death are therefore affirmed.

All sitting. All concur. CUNNINGHAM, J., also concurs by separate opinion.

CUNNINGHAM, J., concurring:

I fully concur with Justice Noble's excellent opinion. I only write to add the following to our analysis on harmless error. On two separate occasions—the trials of

the Appellant in 1998 and 2005—juries have sentenced the Appellant to death. Lisa Hill did not testify in either of those trials. I cannot imagine more persuasive proof that her testimony in this case was harmless.